732 F.2d 954
 235 U.S.App.D.C. 352, 1984-1985 O.S.H.D. ( 26,875
 Raymond J. DONOVAN, Secretary of Labor, on Behalf of
Patricia ANDERSON, Petitioner,
v.
STAFFORD CONSTRUCTION COMPANY and Federal Mine Safety &
Health Review Commission, Respondents.
 No. 83-1566.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 16, 1984.
Decided April 20, 1984.
 
 Petition for Review of an Order of the Federal Mine Safety & Health Review Commission.
 James A. Lastowka, Atty., Federal Mine Safety & Health Review Com'n, Washington, D.C., entered an appearance for respondent, Federal Mine Safety & Health Review Com'n.
 Linda L. Leasure, Atty., Dept. of Labor, Washington, D.C., with whom Cynthia L. Attwood, Associate Sol., and Michael A. McCord, Counsel, Dept. of Labor, Washington, D.C., were on the brief, for petitioner.
 Before WRIGHT, WILKEY and MIKVA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 The Secretary of Labor petitions this court for review of a Federal Mine Safety and Health Review Commission ("FMSHRC" or "Commission") decision holding that Stafford Construction Company did not act unlawfully when it discharged Patricia Anderson from her position as bookkeeper-secretary. Because the Commission's holding is premised on a faulty reading of the pertinent statute, and is not supported by substantial evidence, we reverse and remand for the assessment of backpay and penalties.
 
 I. BACKGROUND
 
 2
 As we point out below, the matter is reviewable by this court under a "substantial evidence" test. Accordingly, we recite the facts in some detail. Patricia Anderson was hired by Stafford Construction Company ("Company") in June 1978 to work for the Company as a secretary and bookkeeper at the Cotter Uranium Mill located near Canon City, Colorado. On December 20, 1978, two investigators from the federal Mine Safety and Health Administration ("MSHA") arrived at the Cotter Mill jobsite to conduct a safety inspection. The MSHA investigation was apparently conducted in response to previous complaints filed by a heavy equipment operator named Stephen Smith. On December 20, Stephen Smith and his brother Tom (likewise, a heavy equipment operator for the Company) filed a written complaint regarding jobsite safety conditions with the MSHA investigators. The Company fired Stephen Smith on the evening of December 20; Tom Smith was fired on January 5, 1979.
 
 
 3
 On the evening of January 30, 1979, Patricia Anderson was summoned to a meeting of Company officials in downtown Canon City. The meeting was in preparation for an MSHA investigation into whether Stephen Smith had been discharged in retaliation for instituting safety complaints. When Anderson was asked to tell the investigators that Stephen Smith's discharge resulted from an overall reduction in force, she responded that she could not lie. The Company fired Anderson on February 12, 1979.
 
 
 4
 The Secretary of Labor subsequently instituted administrative proceedings against the Company, contending that the discharge of Anderson, the Smith brothers, and one other former employee (Donald Hansen) violated section 105(c)(1) of the Federal Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C. Sec. 815(c)(1) (Supp. V 1981). Although the four cases were consolidated for hearing before an ALJ, each case was tried on its individual facts.
 
 
 5
 In the Anderson case, the Secretary of Labor alleged that the discharge was in retaliation for Anderson's refusal to agree to provide MSHA investigators with a statement that Stephen Smith's discharge was the result of an overall reduction in force. The Company defended by arguing that Anderson was discharged because of her incompetence. The first witness to testify in the case was Patricia Anderson. Anderson explained that her job responsibilities included both general secretarial duties and more specific bookkeeping obligations such as maintenance of the payroll and preparation of termination slips. Anderson further testified that effective bookkeeping was hindered by several structural flaws in the Company's accounting system at the Cotter Mill project, such as inadequate recordation of employee work hours, a Company practice of maintaining some pay records in the Canon City office and some in other offices, and conflicting instructions from Company officials. Despite these hindrances to effective bookkeeping, Anderson testified that she had never received any indication that her work was less than satisfactory. To the contrary, she had received express assurances during the month of January from Harold Stafford (the Company president) that her job was secure. Anderson further testified that, effective January 1, 1979, she had received a pay increase and had become a salaried, rather than an hourly, employee.
 
 
 6
 As to the events leading up to her discharge, Anderson testified that she was called at home early on the evening of January 30 by Richard Schneider (the Company's safety officer and job superintendent). Schneider asked her to return to the Cotter Mill jobsite in order to assist him in sorting through the termination slips of employees who had been fired as the result of a reduction in force to document that there had indeed been an overall reduction in force at the Company. Anderson testified that her examination of employee records failed to indicate that a reduction in force had occurred.
 
 
 7
 Shortly after returning home from her meeting with Schneider, Anderson received a call from Company officials summoning her to a meeting at a bank in downtown Canon City. Anderson testified that those present at the meeting included the following Company officials: Harold Stafford, Richard Schneider, Everett Poynter (project manager at the Cotter Mill jobsite), Donald Hansen (assistant project manager), and Mark Jackson (a foreman). According to Anderson, the purpose of this meeting was to instruct her to provide the MSHA investigators with testimony that Stephen Smith was fired as part of an overall reduction in force. Anderson testified that she felt "very intimidated" by the Company officials, who were "all converging on [her]" and telling her what to say to the investigators. Anderson nevertheless informed the Company officials that she would not lie about the reason for Smith's discharge. After further discussion, she was grudgingly told to "[j]ust say whatever you want to."
 
 
 8
 As it turned out, Anderson was never asked to provide the MSHA investigators with a statement. Nevertheless, Anderson testified before the ALJ, her relationship with Harold Stafford underwent a marked downturn in the days following the January 30 meeting. According to Anderson, Stafford began to scowl at her and would refuse to speak to her. Anderson's relationship with Jacquie Stafford, the Secretary-Treasurer and Stafford's wife, also worsened following the January meeting. On February 12, 1979, less than two weeks after the meeting, Anderson was fired for alleged incompetence.
 
 
 9
 Margaret Zinser testified that she worked for the Company during October and November of 1978, and that her responsibilities included helping Anderson "with payroll and whatever else needed to be done." Zinser corroborated Anderson's previous testimony regarding the structural flaws in the Company's system of accounting. She stated that she did not "know how Pat ever accomplished what she did" in the face of these obstacles. Zinser further testified that Anderson was "very conscientious" and "was doing a beautiful job."
 
 
 10
 The final witness put on by the Secretary of Labor was Jeffrey Mueller, a certified public accountant from an independent accounting firm that had been retained by the Company to review its internal control procedures. Mueller testified that his internal control review turned up several flaws in the Company's system of accounting. He nevertheless stated that there was "no question" that Anderson was a capable bookkeeper whose work was "very satisfactory." After Mueller had finished testifying, the Secretary of Labor rested his case.
 
 
 11
 The first witness called by the Company in rebuttal was safety officer and job superintendent Richard Schneider. Schneider corroborated Anderson's testimony that he had called her back to the Cotter Mill jobsite on the evening of January 30. He testified that he and Anderson then went through Company records in an attempt to document a reduction in force. According to Schneider, Anderson went home after completing the records search approximately one hour later. Schneider testified that he again called Anderson later that evening, and instructed her to come to a meeting of Company officials in downtown Canon City. According to Schneider, Anderson was then asked certain questions about the employee records because she was most familiar with them. In general, Schneider's testimony portrayed the meeting as substantially less coercive than the meeting recounted by Anderson. Schneider also mentioned that Anderson and Everett Poynter (the project manager at the Cotter Mill jobsite) had a personality conflict that existed prior to the January 30 occurrences. According to Schneider, Poynter had previously requested that Harold Stafford fire Anderson.
 
 
 12
 The next witness was Harold Stafford. Stafford testified that Anderson was summoned to the downtown meeting on January 30 because he believed that her documentation of employee firings was incomplete. According to Stafford, he never instructed Anderson regarding any statements she should give to MSHA investigators. He did, however, instruct Anderson that she should be careful not to answer the investigators' questions unless she fully understood them.
 
 
 13
 Stafford then provided testimony bearing upon Anderson's performance prior to January 30. In testimony that directly contradicted Jeffrey Mueller's prior testimony, Stafford stated that Mueller had told him that Anderson was incompetent. Stafford also stated that he had previously decided to fire Anderson because of complaints from Everett Poynter. Despite Anderson's alleged incompetence and the Poynter complaints, however, Stafford did admit that he had given Anderson a pay raise in January 1979 by making her a salaried, instead of hourly, employee.
 
 
 14
 The next witness was Jacquie Stafford, whose testimony related to the issue of Anderson's competence as a bookkeeper. She testified that Anderson was responsible for problems concerning the Company's payroll, and that Anderson had caused the Company to make certain double payments to suppliers. Mrs. Stafford admitted on cross-examination, however, that Anderson was not the only employee responsible for keeping payroll records and records of payments to suppliers. She further admitted that no investigation of the incidents had ever been conducted, and that she could not conclusively state that Anderson was at fault. Mrs. Stafford also testified that Jeffrey Mueller had told her that Anderson's work was inadequate.
 
 
 15
 The Company's final witness was Vickie Johnson, who worked for an outside bookkeeping firm that had been retained by the Company in 1978 and 1979. Most of Johnson's testimony related to the fact that the Company's payroll records were in disarray during that time. On cross-examination, however, Johnson admitted that she did not have firsthand knowledge of the Company's bookkeeping operation, and that she was unsure whether the payroll disarray was attributable to Anderson.
 
 
 16
 After deliberating for approximately one year, the ALJ issued an opinion in the consolidated cases disposing of the four discriminatory discharge claims. Secretary of Labor ex rel. Smith v. Stafford Construction Co., 3 F.M.S.H.R.C. 2177 (1981). The ALJ held that the Smith brothers had been discharged in retaliation for their safety complaints, and ordered the Company to pay backpay and penalties. The ALJ next held that the firing of Donald Hansen had not been illegal; he therefore dismissed the Secretary of Labor's complaint in that case. Finally, the ALJ held in the Patricia Anderson case that Anderson's firing was not in retaliation for protected activity. Accordingly, the complaint in her case was also dismissed.
 
 
 17
 The Secretary of Labor petitioned the FMSHRC for review of the ALJ's decision regarding Anderson; the Company cross-petitioned for review of the ALJ's holdings that Stephen and Tom Smith had been illegally discharged. The Commission affirmed the ALJ in all three cases. Secretary of Labor ex rel. Smith v. Stafford Construction Co., 5 F.M.S.H.R.C. 618 (1983). The Secretary of Labor now petitions this court for review of the Commission's decision in the Anderson case. The Company has not sought further review of the Smith decisions.
 
 II. ANALYSIS
 
 18
 Our standard for reviewing the Commission's findings is the same standard that governs FMSHRC review of ALJ findings of fact: we must uphold the Commission's findings if they are supported by substantial evidence. See 30 U.S.C. Sec. 816(a)(1) (Supp. V 1981) ("findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive" in subsequent judicial review proceedings); compare Donovan ex rel. Chacon v. Phelps Dodge Corp., 709 F.2d 86, 87 (D.C.Cir.1983) ("Unlike the Administrative Procedure Act, ... the Commission's generic statute limits the agency's review of an ALJ's findings of fact to an inquiry into whether they are supported by substantial evidence.") (citing 30 U.S.C. Sec. 823(d)(2)(A) (Supp. V 1981)). This court may, of course, reject erroneous legal conclusions of the Commission, especially those that "would [otherwise] frustrate the congressional purpose to encourage the reporting of safety violations...." Baker v. Interior Board of Mine Operations Appeals, 595 F.2d 746, 749 (D.C.Cir.1978).
 
 
 19
 Initially, it should be noted that we have no reason to question the ALJ's holding that Anderson was a "miner" under 30 U.S.C. Sec. 802(g) (Supp. V 1981), even though she was not directly involved in the extraction process. See 3 F.M.S.H.R.C. at 2196 (citing National Industrial Sand Association v. Marshall, 601 F.2d 689 (3d Cir.1979)). Furthermore, even if Anderson did not qualify as a "miner" within the meaning of the Act, she would be protected against retaliation for providing testimony in federal mine safety proceedings involving the Company. Cf. I The Developing Labor Law 262 (C. Morris ed., 2d ed. 1983) (noting that the NLRB has held that even employees who are otherwise not covered under National Labor Relations Act are protected against retaliation for filing charges or giving testimony in Board proceedings).
 
 
 20
 Examination of the record compels us to conclude that the ALJ's decision in the Anderson case is not supported by substantial evidence, and that the Commission erred in holding to the contrary. A fair reading of the decisions of the ALJ and the Commission indicates that they rested, in part, upon an erroneous legal interpretation of what constitutes protected activity under the Federal Mine Safety and Health Act ("Mine Act"). Accordingly, we grant the Secretary of Labor's petition for review.
 
 
 21
 In determining whether Anderson's discharge had been in retaliation for protected activity, both the ALJ and the Commission applied the burden of proof standard articulated in Secretary of Labor ex rel. Pasula v. Consolidation Coal Co., 2 F.M.S.H.R.C. 2786 (1980), rev'd on other grounds sub nom. Consolidation Coal Co. v. Marshall, 663 F.2d 1211 (3d Cir.1981). Under Pasula, the Secretary of Labor bears the initial burden of demonstrating that a discharge was partially motivated by the complainant's protected activity. 2 F.M.S.H.R.C. at 2799. Upon such a showing, a prima facie case is established and the burden shifts to the employer to demonstrate by a preponderance of the evidence that the complainant would have been discharged even if he had not engaged in the protected activity. Id. at 2799-800. This court previously left open the question whether the Pasula standard is valid insofar as it requires the employer to bear the burden of persuasion on its affirmative defense once a prima facie case has been established. See Phelps Dodge, supra, 709 F.2d at 94-95. The Supreme Court decision in NLRB v. Transportation Management Corp., --- U.S. ----, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), however, makes clear that an agency like the Commission has ample authority to adopt the Pasula burden of proof allocation. See Boich v. FMSHRC, 719 F.2d 194, 196 (6th Cir.1983). We thus turn to an examination of whether the ALJ's application of Pasula to the facts of this case is supported by substantial evidence and otherwise in accordance with law.
 
 
 22
 The ALJ held that "[t]he only possible protected activity in this case was the right of Mrs. Anderson to testify that there had not been a reduction in force." 3 F.M.S.H.R.C. at 2197. In denying the Secretary of Labor's discrimination claim, the ALJ relied heavily upon the facts that Anderson never gave a statement to the MSHA investigators and that Anderson was not preparing to testify against the Company on the date of her discharge. The ALJ also found that the Company had not prevented Anderson from providing a statement to the MSHA investigators. Id. at 2197-98. He therefore concluded that Anderson "was not fired in retaliation for any protected activity." Id. at 2198. In affirming the ALJ, the Commission agreed that Anderson's firing was not in any way related to protected activity.
 
 
 23
 We hold that when Anderson asserted to Company officials that she would not tell the MSHA investigators that Stephen Smith was discharged as part of an overall reduction in force, she was engaged in activity that is protected under the Mine Act. Section 105(c)(1) of the Act provides in relevant part:
 
 
 24
 No person shall discharge or in any manner discriminate against ... or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter because such miner, representative of miners or applicant for employment ... has instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding....
 
 
 25
 30 U.S.C. Sec. 815(c)(1) (Supp. V 1981).
 
 
 26
 There can be little doubt that an employee's right to testify freely in mine safety proceedings encompasses the giving of statements to MSHA personnel conducting preliminary investigations. Cf. NLRB v. Scrivener, 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972) (section of National Labor Relations Act prohibiting discrimination against employees who have "filed charges or given testimony" under Act protects employees who gave statements to NLRB field examiner but who did not file charges or give testimony at formal hearing). In the present case, Anderson's refusal to testify as the Company wished is no less protected because it eventually turned out that the MSHA investigators did not ask her to provide a statement. Although a literal reading of the statute might indicate that a discharge is illegal only if the employee has testified or is about to testify against the employer, we decline to adopt such a hypertechnical and purpose-defeating interpretation. Instead, we hold that an employee's refusal to agree to provide MSHA investigators with testimony that the employee in good faith believes to be false is protected activity, regardless of whether the employee eventually happens to be asked for a statement.
 
 
 27
 Our holding that section 105(c)(1) cannot be limited to cases in which an employee eventually provides testimony in a safety proceeding or investigation is supported by the stated congressional direction that the Act's anti-discrimination provisions be broadly interpreted. See S.Rep. No. 181, 95th Cong., 1st Sess. 36 (1977), U.S.Code Cong. & Admin.News 1977, p. 3401, 3436 (section 105(c)(1) should be construed "expansively to assure that miners will not be inhibited in any way from exercising any rights afforded by the legislation"); see also id. at 35, U.S.Code Cong. & Admin.News 1977, p. 3435 ("if miners are to be encouraged to be active in matters of safety and health, they must be protected against any possible discrimination which they might suffer as a result of their participation [in the enforcement of the Act]"). It is also supported by decisions of this court. In Phillips v. Interior Board of Mine Operations Appeals, 500 F.2d 772 (D.C.Cir.1974), cert. denied, 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975), this court interpreted section 105(c)(1)'s predecessor, which prohibited the discriminatory discharge of miners who had, inter alia, "notified the Secretary [of the Interior] or his authorized representative of any alleged violation or danger." See 30 U.S.C. Sec. 820(b) (1976) (amended in 1977 by section 105(c)(1)). The Phillips court held that this provision protected an employee who complained of unsafe conditions to his foreman, even though the employee had never notified the Interior Secretary or an authorized representative of the Secretary. Although recognizing that its holding extended beyond the literal language of the Act, the court believed its interpretation was necessary to achieve the Act's remedial goals. Id. at 783. See also Baker v. Interior Board of Mine Operations Appeals, 595 F.2d 746 (D.C.Cir.1978) (following Phillips).
 
 
 28
 Our reasoning is similar to that used by the Sixth Circuit in NLRB v. Retail Store Employees Union, Local 876, 570 F.2d 586 (6th Cir.), cert. denied, 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 109 (1978), where the court construed Sec. 8(a)(4) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(4) (1976). That section makes it an unfair labor practice for an employer to discriminate against an employee "because he has filed charges or given testimony" in an NLRB proceeding. The employer argued that Sec. 8(a)(4) did not apply to an employee who expressed unwillingness to testify as the employer had instructed, but who was never actually called to testify at an NLRB hearing. The court rejected that narrow reading of Sec. 8(a)(4), stating: "Employees might well feel compelled to offer misleading statements to the Board if they knew they could be fired for showing reticence in coming forward with testimony favorable to the management side." Id. at 591.
 
 
 29
 The Mine Act's antidiscrimination provision has the same policy underlay. Applying such a legal standard, the evidence supports a prima facie case of a violation of section 105(c)(1). The ALJ accepted Anderson's testimony that Company officials asked her to provide MSHA investigators with a statement that Stephen Smith had been fired as part of a reduction in force, and that Anderson had refused to agree to give such a statement. The ALJ also found that after the January 30 meeting, the Company president "didn't talk to Anderson and would come in and glare at her." Finally, the ALJ found that Anderson was fired less than two weeks after she engaged in what we have held was protected activity. 3 F.M.S.H.R.C. at 2195-96.
 
 
 30
 In light of these findings, the ALJ's ultimate conclusion that Anderson's protected activity played no part in her discharge cannot stand. The fact that the Company's adverse action against Anderson so closely followed the protected activity is itself evidence of an illicit motive. See, e.g., NLRB v. Senftner Volkswagen Corp., 681 F.2d 557, 560 (8th Cir.1982) (per curiam); Jim Causley Pontiac v. NLRB, 620 F.2d 122, 126 (6th Cir.1980). There was also undenied testimony that Anderson had previously been given express assurances of job security from the Company president. We conclude that the Secretary of Labor established a prima facie discrimination case, and that the burden should then have shifted to the Company under the Commission's Pasula decision to prove by a preponderance of the evidence that Anderson would have been discharged even absent the protected activity.
 
 
 31
 Because the Commission and ALJ both concluded that a prima facie case had not been established, neither administrative body reached the issue of whether the Company satisfied its burden of proving an affirmative defense. Since all the evidence bearing upon the issue is contained in the record before us, however, we believe that a remand on this issue would serve no purpose. This is particularly so in light of our ultimate holding that only one conclusion would be supportable. Cf. Lanphear v. Prokop, 703 F.2d 1311, 1317 (D.C.Cir.1983) (Title VII race discrimination case) (although district court had not passed upon issue regarding employer's claimed justification for adverse treatment of plaintiff, remand was unnecessary because evidence could justify only one conclusion). For the following reasons, we hold that the Company totally failed to demonstrate by a preponderance of the evidence that Anderson would have been fired regardless of her protected activity.
 
 
 32
 The Company's primary defense was that Anderson was fired due to her incompetence as a bookkeeper. Harold and Jacquie Stafford both testified that the Company experienced problems during Anderson's tenure as bookkeeper. They also testified that Jeffrey Mueller, an independent certified public accountant retained by the Company, had told them that Anderson was incompetent. This testimony, however, was squarely contradicted by Mueller's direct testimony that he had found Anderson to be a capable bookkeeper whose work was very satisfactory. Anderson's excellent performance as a bookkeeper was also attested to by Margaret Zinser, a former Company employee who had worked as an assistant to Anderson. Finally, Harold Stafford granted Anderson a salary increase on January 1, 1979, and subsequently assured her that her job was secure.
 
 
 33
 Despite the fact that Anderson's termination slip stated only that she was fired due to incompetence (i.e., she was "[i]ncapable of handling [her] position"), the Company also apparently argued before the ALJ that Anderson's discharge resulted from a personality conflict between her and the project manager at the Cotter Mill jobsite. Although there is some record evidence supporting the existence of such a personality conflict, the Company failed to prove by a preponderance of the evidence that this conflict was linked to Anderson's discharge. The conflict apparently existed well before Anderson's discharge, and the record contains no indication of events immediately prior to February 12 that would support an inference that the discharge resulted from this situation. The record evidence is entirely too meager to permit the conclusion that Anderson was fired because of a personality conflict between her and the project manager, nor did the ALJ even reach this question.
 
 
 34
 We are left with a record where the ALJ's findings are more than sufficient to establish a prima facie case under the appropriate legal standard; the Company's rebuttal testimony is insufficient to overcome this prima facie case. The evidentiary findings of the ALJ, adopted by the Commission, support such conclusions.
 
 III. CONCLUSION
 
 35
 The Mine Act must be broadly interpreted in order to further the congressional aim of making this Nation's coal and other mines safe places to work. See 30 U.S.C. Sec. 801 (Supp. V 1981). We hold that Patricia Anderson engaged in protected activity when she would not agree with Company officials to provide MSHA investigators with a statement that she believed was false, and that the Secretary of Labor satisfied his burden of proving that this protected activity was a motivating factor in Anderson's discharge. Finally, we hold that the Company failed to rebut this prima facie case by demonstrating that Anderson would have been discharged for reasons unrelated to protected activity. The decision of the Commission is reversed and the case is remanded for the award of backpay and other remedies if warranted.
 
 
 36
 It is so ordered.