**John A. GILBERT, Petitioner,**

v.

**FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION and Sandy Fork Mining Co., Inc., and Secretary of Labor, Respondents.**

No. 87–1499.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 23, 1988.

Decided Jan. 27, 1989.

Tony Oppegard, Hazard, Ky., with whom Stephen A. Sanders was on the brief, for petitioner.

Ronald E. Meisburg, with whom George R. Salem, Sol., Dept. of Labor, Dennis D. Clark, Counsel, Appellate Litigation, and Vicki J. Shteir–Dunn, Attorney, Dept. of Labor, Washington, D.C., were on the brief, for respondent Secretary of Labor.

Ann Rosenthal, Arlington, Va., and Colleen A. Geraghty also entered appearances for respondent Secretary of Labor.

Ronald E. Meisburg, Atty., Sandy Fork Mining Co., Inc., with whom Michael T. Heenan and William D. Florman, Washington, D.C., were on the brief, for respondent Sandy Fork Mining Co., Inc.

L. Joseph Ferrara, Attorney, Federal Mine Safety & Health Review Commission, also entered an appearance for respondents.

Before EDWARDS and WILLIAMS, Circuit Judges, and REVERCOMB,* District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case involves a petition for review of a decision of the Federal Mine Safety and Health Review Commission ("FMSHRC" or "Commission"). The petitioner, John Gilbert, a miner working for Sandy Fork Mining Company ("Sandy Fork"), claims that he was fired by Sandy Fork because of his refusal to perform work that he reasonably believed to be unsafe, and that this action by the employer violated section 105(c)(1) of the Federal Mine Safety and Health Act of 1977 ("Act" or "Mine Act"), 30 U.S.C. § 815(c)(1) (1982). The Commission adopted the finding of an Administrative Law Judge ("ALJ") that Gilbert lacked good faith when he refused to work; accordingly, FMSHRC rejected Gilbert's claim that he was the subject of a discriminatory discharge in violation of the Act. FMSHRC also held that Gilbert had no right to initiate an action in his own behalf under section 105(c)(3) of the Act prior to a determination by the Secretary of Labor ("Secretary") as to whether a violation of section 105(c) had occurred. Because Gilbert filed his complaint before the Secretary had made this determination, and because the Secretary subsequently filed a complaint on behalf of Gilbert, the Commission dismissed Gilbert's individual complaint. Gilbert petitions this court to reverse the Commission's dismissal of his individual complaint, and to set aside the Commission's judgment on the merits of his claim under the Act.

On the merits of the case, we can find no basis in the record before us to support the

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

Commission's judgment against Gilbert. We therefore reverse and remand for further consideration by FMSHRC.

We also remand for further consideration of Gilbert's individual complaint. The ALJ found that, under then-extant Commission rules, Gilbert properly filed an individual action under section 105(c)(3) when the Secretary failed to act on his complaint within 90 days. The Secretary petitioned FMSHRC for discretionary review of the ALJ's determination on this point. Pursuant to the Secretary's petition, the Commission overturned the rule under which Gilbert had filed his individual complaint, and adopted a new rule that individual complaints may not be brought under section 105(c)(3) until *after* the Secretary explicitly rejects a miner's claim. This new rule was applied retroactively to cover Gilbert's complaint. Because Gilbert challenged the rule only in its retroactive application to him, we do not consider and express no opinion on the validity of the change in its prospective application. Nonetheless, because we can find no sufficient basis for the retroactive application of this change in policy, we reverse and remand FMSHRC's decision dismissing Gilbert's individual complaint.

## I. Background

### A. *The Facts of the Case*

John Gilbert was employed at Sandy Fork's No. 12 underground mine for three-and-a-half years prior to the incidents prompting his refusals to work on August 6 and 7, 1985. During the last two-and-a-half years of his employment, Gilbert was a continuous miner operator[1] on the evening shift from 3:00 p.m. to 11:00 p.m. He was described by his supervisor as a good employee. Joint Appendix ("J.A.") 239, 262–63.

Gilbert's dispute with Sandy Fork concerned the condition of the mine roof in the area in which he was working, the 002 section of No. 12 mine, which consisted of six entries. For several weeks prior to August 6, the 002 section had experienced difficult roof conditions caused by "hill seams," encountered when mining operations are conducted near surface outcroppings. A "hill seam" is a crack or fault in a mine roof that generally has mud or water seeping from it. Gilbert testified that rock had fallen on his mining machine during this two week period, J.A. 66–72; and, further, that on August 5, he and another miner operator had left certain work locations because of "working" hill seams, that is, those emitting creaking noises indicative of unstable roof conditions, J.A. 73–74.

Before starting work on the afternoon of August 6, Gilbert and the other continuous miner operator in his section expressed their continuing concerns to their Section Foreman about the roof conditions; the Foreman responded by giving them permission to work together operating one mining machine so that they could look out for one another's safety. *Gilbert v. Sandy Fork Mining Co.*, 8 F.M.S.H.R.C. 1084, 1088 (1986). When the two reached the 002 section, the continuous miner operator who had worked the earlier shift told them that the roof was breaking up. Gilbert and his coworker then inspected the roof in the section before starting work. *Id.* The Section Foreman, and Sandy Fork's Chief Engineer and Acting Safety Director, also examined the 002 section on August 6 and 7. Testimony indicates, and the ALJ found, that the No. 3 entry had a hill seam and a stress crack in the rib and roof and that the crosscut approaching the No. 4 "kickback"[2] had a hill seam and stress cracks. *Id.* at 1088, 1090. While testimony also indicates that hill seams were present in other entries of the section, the ALJ found that there were no hill seams exposed in the No. 4 kickback itself. *Id.* at 1090.[3]

---

1. The "continuous miner" is a machine with rotating drum heads that extracts coal by grinding it from the mine face.

2. A "kickback" is an entry mined in the direction opposite to its normal course because of adverse roof conditions.

3. The ALJ noted that a Mine Safety and Health Administration ("MSHA") inspector testified that there was a hill seam in the No. 4 kickback, but the ALJ found that the MSHA must have been in error, because the inspector did not cite Sandy Fork for a violation of its roof control plan on this fact. 8 F.M.S.H.R.C. at 1090 n. 6.

After examining the conditions in this section, Gilbert told his coworker that he was going to refuse to finish the work in the No. 4 kickback. Gilbert then left the mine to speak with his section foreman again about the condition of the roof. *Id.* at 1089. In response to Gilbert's complaint, the section foreman suggested that they could build a few extra cribs, or roof supports, to strengthen the roof, or that the foreman could "stand with" Gilbert and his coworker to watch the roof as they cut the coal. This did not satisfy Gilbert, who left the underground mine to talk to someone higher in management. *Id.* He then spoke to the General Mine Foreman, who advised Gilbert to go home and return to work the following day to meet with the mine Superintendent and General Manager.[4] With management's permission, Gilbert left the mine. Although the Section Foreman proceeded to spend the remainder of the shift building more cribs in the No. 3 entry, there is nothing in the record to indicate that Gilbert was ever told of this work; and, in fact, Gilbert apparently never learned of these efforts because, during the night, a major roof fall occurred in the No. 3 entry and the area was "dangered off." *Gilbert v. Sandy Fork Mining Co.,* 9 F.M.S.H.R.C. 1327, 1330 (1987).[5]

On the morning of August 7, 1985, because of Gilbert's expressed concerns and because of the serious roof fall that had occurred in the No. 3 entry, the mine Superintendent and General Manager went underground to inspect the areas in question. Gilbert arrived at the mine office about 9:00 a.m., six hours before the start of his scheduled shift. *Id.* at 1331. While waiting for the managers, Gilbert was told *by another miner* of the roof fall. When the two supervisors returned to the office about 9:30 or 10:00 a.m., Gilbert asked what they intended to do to support the roof; they essentially replied that they

were doing all they could given what they found underground. *Id.* They did not inform Gilbert of any specific steps that were being taken to improve the condition of the roof. Indeed, no one in management bothered to inform Gilbert of the roof fall that had occurred the night before. J.A. 62–63, 159, 300. When Gilbert specifically asked management about the size and location of the roof fall, he testified that he was told that it was "none of his concern." J.A. 63.[6] This testimony was not refuted by Sandy Fork.

When Gilbert perceived that his supervisors intended to do nothing to address his concerns, he again told them that he was afraid of the mine roof and requested alternative work in another mine. The supervisors told him that the only job available for him was his current position. Gilbert then handed in his safety equipment and left the mine, considering himself "fired." J.A. 64.

On August 8, an inspector from the Department of Labor's Mine Safety and Health Administration ("MSHA") inspected the mine. He determined that the roof fall was caused by "turning [a] cross-cut in the direction of an exposed hill seam," and he recommended that Sandy Fork take a number of precautionary measures in the future, including narrowing its entries, taking shallower cuts, and using larger roof bolts. Sandy Fork implemented these recommendations but never so informed Gilbert. J.A. 189–91, 312, 325–26.

Apart from the events on August 6 and 7, the record also indicates that Gilbert had narrowly avoided injury in two separate rock falls that occurred in section 002 during the two weeks prior to his refusal to work on August 7. The first rock fall occurred when two hill seams gave way as Gilbert was cutting coal, causing the mine roof to fall on his continuous miner and on

---

**4.** Gilbert went to the mine Superintendent's home that night to discuss his concerns. However, the Superintendent told Gilbert he preferred to meet with him at the mine the next morning. 8 F.M.S.H.R.C. at 1089.

**5.** There is some dispute over whether there were one or two falls that night. Resolution of this

issue is not material to our disposition of the case, however.

**6.** Gilbert also testified that the managers responded to his inquiry by asking him if he were a "top" (or roof) "expert;" he replied that he was not, but that he could get one if that was what they wanted. J.A. 65.

a shuttle car driven by another miner. J.A. 68–69. This roof fall occurred within two feet of where Gilbert was standing, and pulled out the roof bolts and straps which Sandy Fork had installed to support the roof. J.A. 70–71, 88, 122–24. It took four hours to remove Gilbert's continuous miner from under this fall. J.A. 72. Then, just a few nights before August 6, Gilbert testified that a "slug of sandrock" weighing an estimate of one to two tons fell on his continuous miner as he was taking a cut, approximately fifteen feet from where he was standing. J.A. 73–74; 9 F.M.S.H.R.C. at 1329.

Gilbert claims that these incidents are illustrative of the serious roof control problems that were experienced by Sandy Fork in the 002 section. The poor conditions are also reflected in Sandy Fork's daily preshift and on-shift examination reports for the two weeks preceding August 6, *see*

Appellant's Exhibit No. 3, J.A. 334–77, as well as in the report of the MSHA official who inspected the mine during the first week of August, J.A. 186–87.

## B. *Statutory Framework*

Section 105(c) of the Mine Act, 30 U.S.C. § 815(c) (1982), prohibits a mine operator from discharging a miner on account of the miner's engaging in protected, safety-related conduct. Section 105(c)(2), 30 U.S.C. § 815(c)(2) (1982),[7] provides that any miner who believes he has been discharged in violation of section 105(c)(1), 30 U.S.C. § 815(c)(1) (1982),[8] may file an administrative complaint with the Secretary of Labor, who shall investigate the miner's complaint and, upon the finding of a violation, shall file an action with FMSHRC seeking appropriate relief on behalf of the miner. Section 105(c)(3), 30 U.S.C. § 815(c)(3) (1982),[9]

---

7. Section 105(c)(2) of the Act provides, in pertinent part:

 Any miner or applicant for employment or representative of miners who believes that he has been discharged, interfered with, or otherwise discriminated against by any person in violation of [§ 105(c)(1) ] may ... file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall forward a copy of the complaint to the respondent and shall cause such investigation to be made as he deems appropriate. Such investigation shall commence within 15 days of the Secretary's receipt of the complaint.... If upon such investigation, the Secretary determines that the provisions of this subsection have been violated, he shall immediately file a complaint with the Commission, with service upon the alleged violator and the miner, applicant for employment, or representative of miners alleging such discrimination or interference and propose an order granting appropriate relief.

8. Section 105(c)(1) of the Act provides, in pertinent part:

 No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter because such miner ... has instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding, or because of the exercise by such miner ... on behalf of

himself or others of any statutory right afforded by this chapter.

9. Section 105(c)(3) states, in relevant part:

 Within 90 days of the receipt of a complaint filed under paragraph (2), the Secretary shall notify, in writing, the miner, applicant for employment, or representative of miners of his determination whether a violation has occurred. If the Secretary, upon investigation, determines that the provisions of this subsection have not been violated, the complainant shall have the right, within 30 days of notice of the Secretary's determination, to file an action in his own behalf before the Commission, charging discrimination or interference in violation of paragraph (1). The Commission shall afford an opportunity for a hearing ... and thereafter shall issue an order, based upon findings of fact, dismissing or sustaining the complainant's charges and, if the charges are sustained, granting such relief as it deems appropriate, including, but not limited to, an order requiring the rehiring or reinstatement of the miner to his former position with back pay and interest or such remedy as may be appropriate. Such order shall become final 30 days after its issuance. Whenever an order is issued sustaining the complainant's charges under this subsection, a sum equal to the aggregate amount of all costs and expenses (including attorney's fees) as determined by the Commission to have been reasonably incurred by the miner, applicant for employment or representative of miners for, or in connection with, the institution and prosecution of such proceedings shall be assessed against the person committing such violation.

provides that the Secretary has 90 days in which to make this determination, and if the Secretary determines that no violation has occurred, the miner may file his own action before the Commission.

The Commission's Procedural Rule 40(b), 29 C.F.R. § 2700.40(b) (1987),[10] implements section 105(c). At the time when Gilbert filed his complaint, Rule 40(b) included a clause that granted a miner the right to file a complaint in his own behalf if the Secretary failed to make a determination within 90 days. In this case, however, the Commission decided to eliminate this clause, thus allowing private suits only *after* the Secretary has explicitly rejected a miner's claim.

### C. *Prior Proceedings*

On August 8, 1985, the day after he left the mine, Gilbert filed a section 105(c) discrimination complaint with the MSHA alleging that he had been discriminatorily discharged. The Secretary timely initiated an investigation of the complaint, pursuant to section 105(c)(2) of the Mine Act. However, the Secretary did not make a determination within 90 days of receipt of Gilbert's complaint, as required by section 105(c)(3) of the Act, as to whether a violation of section 105(c) had occurred.

By letter dated November 15, 1985, the Secretary informed Gilbert that the investigation of his complaint had not yet been completed. The letter also stated: "By the terms of the Act and the Federal Mine Safety and Health Review Commission's procedural rules, you have a right to file your own complaint with the Commission because the Secretary has not completed his consideration within 90 days." On December 23, 1985, Gilbert filed his own discrimination complaint with the Commission pursuant to Commission Procedural Rule 40(b). Two months later, on February 24, 1986, the Secretary finally filed a section

105(c)(2) discrimination complaint on Gilbert's behalf with the Commission. The Secretary then moved to dismiss Gilbert's individual complaint in light of the MSHA complaint. The ALJ deferred ruling on the motion and permitted both complaints to proceed to hearing.

In his decision on the merits, the ALJ denied the Secretary's motion to dismiss. He found that, under Rule 40(b), Gilbert had the right to file an individual action if the Secretary failed to make a determination within 90 days. Thus, the ALJ found that he had "jurisdiction to entertain Mr. Gilbert's case (under section 105(c)(3) and Commission Rule 40(b)) as well as the Secretary's case brought on behalf of Mr. Gilbert under section 105(c)(2) of the Act." 8 F.M.S.H.R.C. at 1087.

On the merits of Gilbert's discrimination claim, the ALJ treated Gilbert's departure from the No. 4 kickback on the afternoon of August 6 and from the mine premises on the morning of August 7 as two distinct work refusals, and found that neither was reasonable or made in good faith. *Id.* at 1090–91. Addressing the events of August 6, the ALJ found that Gilbert had four to five hours of work left in the No. 4 kickback when he refused to cut coal; and there was "no credible evidence that any unusual hazard did in fact exist in the No. 4 kickback." *Id.* at 1091. The ALJ concluded that Gilbert's work refusal was "premature," and, therefore, not reasonable and in good faith, because he had not given the Sandy Fork management time to provide additional support to the roof. *Id.*

With respect to Gilbert's decision to leave the mine on August 7, the ALJ concluded that "Gilbert had not been discharged and was given the opportunity to return to work" at his old job. *Id.* The ALJ argued that, because the roof fall in No. 3 entry had changed "conditions ... significantly," and because Gilbert "had

---

10. At the time when Gilbert filed his complaint, Commission Procedural Rule 40(b) stated:

A complaint of discharge, discrimination or interference under section 105(c) of the Act, may be filed by the complaining miner, representative of miners, or applicant for employment if the Secretary determines that no vio-

lation has occurred, *or if the Secretary fails to make a determination within 90 days after the miner complained to the Secretary.*
(Emphasis added.) New Rule 40(b), as adopted by the Commission in this case, deleted the highlighted final clause of the sentence.

been given no specific work assignment and could not have known where in the No. 12 mine he would be working ... he could not at this time have entertained a reasonable or a good faith belief that he would have been required to work in a hazardous condition." *Id.* Finally, the ALJ also suggested that Gilbert's refusals may have been motivated by his interest in being transferred to a day shift assignment. *Id.* at 1092.

In a decision dated August 25, 1987, FMSHRC concluded that "substantial evidence supports the judge's finding that Gilbert was not discharged but voluntarily gave up his job at a point in time when he was not faced with a hazard justifying a refusal to work at that time." 9 F.M.S.H.R.C. at 1336. The Commission therefore adopted the ALJ's conclusion that section 105(c)(1) had not been violated.

The Commission also held that the ALJ had erred in denying the Secretary's motion to dismiss Gilbert's individual complaint filed pursuant to Commission Procedural Rule 40(b). The Commission observed that the "intent of this procedural rule was to protect miners from prejudicial delay by the Secretary in filing discrimination complaints and to encourage the Secretary to meet his statutory responsibilities under section 105(c) in a timely manner." *Id.* Nevertheless, the Commission noted that the Secretary, who until this time had not objected to the rule, now argued that Rule 40(b)'s authorization of a private complaint prior to the Secretary's determination conflicted with the enforcement schemes set forth in section 105(c) of the Mine Act. *Id.* The Commission therefore deleted the clause in Rule 40(b) that permitting the filing of individual actions when the Secretary has not made a determination of a violation within 90 days. The Commission stated that its decision was to apply "prospectively and also to any such individual complaints pending presently before the Commission," *id.* at 1338–39, including this case and its companion case, *Chaney Creek Coal Co. v. FMSHRC*, 9 F.M.S.H.R.C. 1314 (1987), *rev'd on other grounds*, 866 F.2d 1424 (D.C.Cir.1989).

Gilbert has petitioned this court for review both of his discrimination claim and the dismissal of his individual action.

## II. ANALYSIS

### A. *The Discrimination Claim*

It is by now well settled that section 105(c)(1) protects a miner's right to refuse work under conditions that he reasonably and in good faith believes to be hazardous. *See Secretary ex rel. Bush v. Union Carbide Corp.*, 5 F.M.S.H.R.C. 993, 997 (1983); *Secretary ex rel. Robinette v. United Castle Coal Co.*, 3 F.M.S.H.R.C. 803 (1981). Although the Mine Act does not state this right explicitly, this court has recently noted that "the legislative history of the statute unequivocally supports the Commission's view." *Simpson v. FMSHRC*, 842 F.2d 453, 458 (D.C.Cir.1988).

In analyzing whether a miner's fear is reasonable, the Commission consistently has held that the perception of a hazard must be viewed from the miner's perspective at the time of the work refusal. *Secretary ex rel. Pratt v. River Hurricane Coal Co.*, 5 F.M.S.H.R.C. 1529, 1533–34 (1983); *Haro v. Magma Copper Co.*, 4 F.M.S.H.R.C. 1935, 1944 (1982). To be accorded the protection of the Act, the miner need not objectively prove that an actual hazard existed. *Secretary ex rel. Hogan & Ventura v. Emerald Mines Corp.*, 8 F.M.S.H.R.C. 1066, 1072–73 (1986); *Pratt*, 5 F.M.S.H.R.C. at 1533–34; *Haro*, 4 F.M.S.H.R.C. at 1943–44; *Robinette*, 3 F.M.S.H.R.C. at 810. The Commission has explained that "[g]ood faith belief simply means honest belief that a hazard exists." *Robinette*, 3 F.M.S.H.R.C. at 810. The burden of proving good faith rests with the complaining miner, but the miner need not demonstrate an absence of bad faith. *Bush*, 5 F.M.S.H.R.C. at 997.

Thus, the principal question here is relatively straightforward: Did Gilbert reasonably and in good faith believe that he would be required to work in hazardous mine conditions? In reviewing a Commission judgment on this issue, the Mine Act instructs that a reviewing court must up-

hold Commission findings "if supported by substantial evidence on the record considered as a whole." 30 U.S.C. § 816(a)(1) (1982); *see also Donovan ex rel. Anderson v. Stafford Constr. Co.*, 732 F.2d 954, 958 (D.C.Cir.1984).

■■■■ The Commission has employed two evidentiary guidelines to facilitate the assessment of a miner's "good faith." First, "[w]hen reasonably possible, a miner refusing work should ordinarily communicate, or at least attempt to communicate, to some representative of the operator, his belief in the safety or health hazard at issue." *Secretary ex rel. Dunmire & Estle v. Northern Coal Co.*, 4 F.M.S.H.R.C. 126, 133 (1982). This requirement serves an "evidentiary function" in " 'weeding out work refusals infected by bad faith.' " *Simpson*, 842 F.2d at 459 (quoting *Dunmire*, 4 F.M.S.H.R.C. at 134). Second, when a miner expresses a reasonable, good faith fear in a hazard, the operator has a corresponding obligation to address the perceived danger. *Bush*, 5 F.M.S.H.R.C. at 997–98; *Pratt*, 5 F.M.S.H.R.C. at 1534; *Secretary v. Metric Constructors, Inc.*, 6 F.M.S.H.R.C. 226 (1984), *aff'd sub nom. Brock ex rel. Parker v. Metric Constructors, Inc.*, 766 F.2d 469 (11th Cir.1985); *Hogan & Ventura*, 8 F.M.S.H.R.C. at 1074. In other words, if a miner refuses to work only after an operator has failed or refused to respond to a reasonable complaint regarding an unsafe work condition, it is not likely that the miner has acted in bad faith.

■■■■ In the instant case, even accepting the facts exactly as FMSHRC found them, we can find no basis in the record to support the determination that Gilbert could not have entertained a reasonable, good faith belief that he would be required to work in a hazardous area. The undisputed evidence reveals that Gilbert was working in an area in the mine in which it appeared to him that there were serious cracks and faults in the mine roof, such that his safety was in jeopardy; that after conferring with members of management, he left work *with their permission;* that during the course of his conversations with members of management on August 6, Gilbert was instructed to return to mine premises at 9 a.m. on the morning of August 7; and that between the time when Gilbert left work and the time when he returned to the mine site at 9 a.m., there was a serious roof fall in his work area. The evidence reveals further that Gilbert learned of the roof fall from coworkers, not from management; and when Gilbert met with two members of management and inquired as to what was being done to correct the unsafe roof conditions in his work area, they refused to address his concerns. Finally, Gilbert testified, apparently without refutation, that when he inquired about the rock fall(s) that had occurred after he left work, he was told that it was "none of his concern." J.A. 63.

FMSHRC argues that, when Gilbert left the mine on the morning of August 7, he had not been given a specific work assignment for his evening shift later that day, and, therefore, he "could not have known where in the No. 12 mine he would be working." 9 F.M.S.H.R.C. at 1333 (quoting the ALJ opinion, 8 F.M.S.H.R.C. at 1091). Thus, according to the Commission, Gilbert could not have entertained a reasonable or good faith belief that he would have been required to work in a hazardous condition. *Id.* at 1335.

This analysis makes no sense whatever on the record at hand. Management had refused to address Gilbert's concerns when he inquired about the admittedly unsafe roof conditions *in his work area.* Gilbert was not told that he would be assigned to some safe area in the No. 12 mine, or that the problems in his area had been corrected. Indeed, when Gilbert asked about the rock fall that had occurred after he left work on the 6th, he was told that it was *none of his business.* Therefore, on the record before us, it would appear that Gilbert had every reason to believe that he would be required to work in hazardous conditions.

The Commission's analysis simply ignores these facts, and it offers none to counter them. There is nothing in the Commission decision regarding the reasonableness of Gilbert's fears. Furthermore,

the Commission decision is devoid of any analysis of management's *response* to Gilbert's express fears, *i.e.,* to determine whether Gilbert acted in good faith in refusing to work. There is no doubt that Gilbert's initial fears were reasonable: he had experienced several roof falls in his work area; his foreman had attempted to correct the problem; and Gilbert was *given permission* to leave work on the 6th in light of existing safety problems. It is also clear that Gilbert's fears remained reasonable when he talked with management on the 7th: he was told of no specific efforts to correct the safety problems in his work area; he had learned of new work hazards caused by the roof fall that had occurred after he had left work on the 6th; when he inquired about the situation, management told him that the latest roof fall was "none of his concern;" and he was given no indication that he would be allowed to work in an area other than the one in which the roof falls had occurred and that he believed to be unsafe. In light of these facts, it is impossible to understand how FMSHRC could find that Gilbert "could not ... have entertained a reasonable or good faith belief that he would have been required to work in a hazardous condition."

On the record as we understand it, it is plain that Gilbert made a good faith attempt to communicate his reasonable fears to management. What is not clear, however, is whether management addressed Gilbert's concerns in a way that his fears reasonably should have been quelled. In other words, did management explain to Gilbert that the problems in his work area had been corrected? Or did management indicate to Gilbert that he would be assigned to another area in the mine that was free of safety problems? Or did management indicate to Gilbert that the situation was unsettled, and that he should wait five hours (until the start of his assigned shift) before inquiring further about safety con-

ditions in his area? These questions must be answered by the Commission in order for it to determine whether the management at Sandy Fork reasonably addressed Gilbert's fears on the morning of August 7.[11] If management effectively "stonewalled" Gilbert in responding to his inquiries on the 7th, then his continued fears regarding work hazards were reasonable, and his refusal to return to work cannot be viewed as either unreasonable or in bad faith. On remand, the Commission will be required to make the necessary factual findings to address these issues.

**B. *The Commission's Dismissal of Gilbert's Individual Action***

■ As noted above, in addition to rejecting Gilbert's claim on the merits, the Commission also held that the ALJ had erred in denying the Secretary's motion to dismiss Gilbert's individual complaint filed pursuant to Rule 40(b). In reaching this judgment, FMSHRC overturned an established Commission policy allowing an individual to file an action in his own behalf when the Secretary fails to act on his complaint within 90 days. Under the new policy, an individual complaint can be filed under section 105(c)(3) only after the Secretary explicitly rejects a miner's claim. This new policy was applied retroactively to cover Gilbert's complaint. Because we can find no sufficient basis for the Commission's *retroactive* application of the changed policy under Rule 40(b), we reverse and remand FMSHRC's decision dismissing Gilbert's individual complaint.

In reaching this conclusion, we do not consider whether the Commission, in changing its course by rescinding the established policy under Rule 40(b), supplied a "reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *see*

---

**11.** Management contends that the time and effort spent in reinforcing the roof of the mine proves the sufficiency of its response to Gilbert. We disagree. Indeed, it is ironic that, despite the alleged efforts of management, the very fears that Gilbert expressed on August 6—especially about the No. 3 entry way—were borne

out by a roof fall *in that area* after he left work on the 6th. The crucial question here concerns what management said to Gilbert when he came in on the 7th, especially given that Gilbert knew there had been further roof falls after he left work on the 6th.

*also Yakima Valley Cablevision, Inc. v. FCC,* 794 F.2d 737, 745 (D.C.Cir.1986). In other words, we do not consider and express no opinion on whether new Rule 40(b) should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act § 706(2)(A), 5 U.S.C. § 706(2)(A) (1982). These questions are not before us, because Gilbert does not challenge the *prospective* application of the new policy covering individual complaints under Rule 40(b). Rather, the question in this case is whether the Commission adequately explained its decision to change its enforcement policy *retroactively. Yakima Valley,* 794 F.2d at 745. We find that the Commission failed to offer any legitimate justification for the retroactive application of its new policy; indeed, there is no indication that the Commission even recognized that such a justification is legally required. *See International Union of Elec. Workers v. NLRB,* 727 F.2d 1184, 1194–95 (D.C.Cir. 1984) (*"IUE v. NLRB"*); *Retail, Wholesale & Dep't Store Union v. NLRB,* 466 F.2d 380, 390 (D.C.Cir.1972).

In *IUE v. NLRB,* this court noted five factors to be considered in determining whether a new rule developed in an adjudication should be given retroactive effect:

(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

727 F.2d at 1194 (citing *Retail, Wholesale & Dep't Store Union,* 466 F.2d at 390). In applying these factors to the instant case, we can find no justification to support the Commission's decision on retroactivity.

First, it is clear that the question regarding individual complaints under Rule 40(b) and section 105(c)(3) is not one of first impression. In fact, FMSHRC's decision itself notes that the change in policy merely results from a change in the Commission's reading of congressional intent, not from the novelty of the situation presented. 9 F.M.S.H.R.C. at 1336.

Second, there is no doubt that the Commission's changed policy under Rule 40(b) resulted in "an abrupt departure from well established policy." As the dissenting Commissioners pointed out, *see* 9 F.M.S.H. R.C. at 1340 (Doyle and Nelson, Comm'rs, concurring in part and dissenting in part), the rule under which Gilbert filed his individual complaint had been reaffirmed by the Commission as recently as June 1986, in *Secretary ex rel. Hale v. 4-A Coal Co.,* 8 F.M.S.H.R.C. 905, 907 n. 3 (1986).

Third, it is equally clear that Gilbert "relied on the former rule" in electing to file an individual complaint under section 105(c)(3). Indeed, in November 1985, the Secretary instructed Gilbert, by written notice, that

[b]y the terms of the Act and the Federal Mine Safety and Health Review Commission's procedural rules, you have a right to file your own complaint with the Commission because the Secretary has not completed his consideration within 90 days.

9 F.M.S.H.R.C. at 1340.

Fourth, Gilbert will suffer an unfair burden if the new Rule 40(b) is applied retroactively to cover his case. If Gilbert's individual action is dismissed, he will lose the right to seek attorney's fees if his claim is upheld on the merits. This is so because he can recover fees as a complainant under section 105(c)(3), but not as an intervenor under section 105(c)(2). *See Chaney Creek Coal Co. v. FMSHRC,* 866 F.2d 1424 (D.C. Cir.1989); *Eastern Associated Coal Corp. v. FMSHRC,* 813 F.2d 639 (4th Cir.1987). It would be the height of unfairness to deprive Gilbert of the right to recover fees when it is clear that he elected to pursue his individual complaint on the assumption that fees would be available to him if he prevailed in his claim. If Gilbert had known that he would be cast as an "intervenor" in this case, he might well have

decided against pursuing an individual suit unless and until the Secretary rejected his claim. But he was explicitly instructed by the Secretary that he had a right to pursue a complaint in his own behalf under section 105(c)(3). Gilbert did, in fact, pursue a complaint on his own for three months before the Secretary made a determination on his complaint; Gilbert's action was taken in reasonable reliance on the Commission's old Rule 40(b). If the new rule is applied retroactively, Gilbert will be required to shoulder the entire burden of attorney's fees whether he wins or loses on the merits; this would be grossly unfair because the burden is one that Gilbert had no reason to expect when he elected to pursue his own complaint.

Finally, there is nothing in the FMSHRC decision indicating a significant "statutory interest" sufficient to overcome the foregoing factors, all of which militate against applying the new rule retroactively to cover Gilbert's case. The Commission's opinion merely suggests that the old Rule 40(b) was inconsistent with the purposes underlying the Mine Act. This approach is wholly inadequate to justify the retroactive application of a new policy, because it fails to balance the "statutory interest" factor against the other four factors noted in *IUE v. NLRB*. Indeed, the Secretary seemed to indicate that the government believed any statutory interest would be *outweighed* by Gilbert's reliance on the old rule and other factors. As noted in *Chaney Creek*, slip op. at 11 n. 8, during oral argument of these two cases, counsel for the Secretary appeared to concede that the government had no case that it wished to pursue in defense of the Commission's retroactive application of the new rule. The government appeared solely for the purpose of defending the *prospective* application of the new rule.

Because the Commission does not even purport to identify a statutory interest sufficient to overcome the factors that weigh against retroactive application of an amended Rule 40(b), and because counsel offers no explanation of this FMSHRC omission, we hold that the FMSHRC decision to apply the new rule retroactively

was arbitrary and capricious. *See Yakima*, 794 F.2d at 746–48. We therefore reverse and remand so that the Commission may weigh any statutory interest against the other factors involved in determining the efficacy of retroactively applying any new agency rule, pursuant to the criteria set forth in *IUE v. NLRB* and the principles identified in this opinion.

### III. CONCLUSION

On the merits of the case, we can find no basis in the record to support the Commission's judgment against Gilbert. We therefore reverse and remand for further consideration by the Commission consistent with this opinion. We also reverse and remand FMSHRC's decision dismissing Gilbert's individual complaint under section 105(c)(3).

*Reversed.*