**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Appellant,**

v.

**NATIONAL MEDIATION BOARD, North Carolina State Ports Authority, and North Carolina Ports Railway Commission, Appellees.**

No. 88–5179.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1989.

Decided March 24, 1989.

Ernest L. Mathews, with whom Thomas W. Gleason, New York City, was on the brief, for appellant.

Edward R. Cohen, Atty., U.S. Dept. of Justice, with whom John R. Bolton, Asst. U.S. Atty. Gen., Jay B. Stephens, U.S. Atty., John F. Cordes, Atty., U.S. Dept. of Justice, and Ronald M. Etters, General Counsel, Nat. Mediation Bd., Washington, D.C., were on the brief, for appellee Nat. Mediation Bd.

Dennis P. Myers, Asst. Atty. Gen. of State of N.C., Raleigh, N.C., was on the brief for appellee North Carolina State Ports Authority.

Roy A. Giles, Jr., Asst. Atty. Gen. of State of N.C., Raleigh, N.C., was on the brief for appellee North Carolina Ports Railway Com'n.

Before ROBINSON, MIKVA and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This case involves the definition of "carrier" under the Railway Labor Act ("Act"), 45 U.S.C. § 151, *First.* Appellant, the International Longshoremen's Association, AFL–CIO ("ILA"), challenges the decision of the National Mediation Board ("NMB" or "Board") that the North Carolina State Ports Authority ("SPA") is not a "carrier" within the meaning of the Act. The district court dismissed appellant's complaint and sustained the NMB. We reverse, because we find that the NMB did not apply the statutory test for "carrier" in a rational and reviewable manner.

I.

The SPA is an agency of the State of North Carolina, created for the purpose of owning and operating the ocean port terminals at Wilmington and Morehead City, North Carolina. *See* N.C.Gen.Stat. §§ 143B–452 through 143B–467 (1987). There is a small switching railroad at each port, and in 1970 the NMB certified the ILA as the bargaining representative for certain dockmen, warehousemen, and security guards who worked on the railroads. *See North Carolina Port Authority,* 5 N.M.B. 288 (1970).

In 1979, the North Carolina General Assembly created the North Carolina Ports Railway Commission ("PRC"), *see* N.C.Gen. Stat. §§ 143B–469 through 143B–469.3 (1987), and mandated that

[a]s soon as practicable, the North Carolina State Ports Authority shall transfer to the North Carolina Ports Railway Commission its railway equipment, railway property, and railway operations. This transfer shall include tracks, yards, equipment, trackage rights, franchises, licenses, and leases connected with the railway operations.

1979 N.C.Sess.Laws ch. 159 § 9.

In 1980, negotiations between the ILA and SPA had failed to produce a collective bargaining agreement and the ILA sought to invoke the services of the NMB. SPA moved to dismiss the NMB proceeding on the ground that it was no longer a "carri-

er" within the jurisdiction of the NMB because its railroad functions had been transferred to the PRC. The NMB agreed with SPA, and ruled that "the certifications held by the ILA are no longer of any effect since the Ports Authority is no longer a carrier within the meaning of the Railway Labor Act." *North Carolina State Ports Authority and North Carolina Ports Railway Commission*, 9 N.M.B. 398, 402 (1982). The NMB found that although the PRC was a carrier, 9 N.M.B. at 402, the PRC "is not directly or indirectly owned or controlled by the" SPA, *id.*, and therefore the SPA was no longer a carrier.

The ILA filed a complaint in United States district court, alleging that the NMB had failed to apply properly section 1, *First* of the Act, which provides:

> The term "carrier" includes * * * any company which is directly or indirectly owned or controlled by *or under common control with any carrier by railroad* and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad * * *.

45 U.S.C. § 151, *First* (emphasis added). The ILA argued that the NMB did not apply the "common control" test, because it failed to consider the possibility that the SPA was "under common control with" the PRC. The ILA maintained that even though the SPA and PRC might be independent agencies, both were under the control of the State of North Carolina. The NMB, according to ILA, should have found that SPA was "under common control with" PRC, which had been found to be a carrier. The NMB then should have determined whether SPA met the second test of a carrier, the so-called "service prong":

> [whether it] operates any equipment or services or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad * * *.

45 U.S.C. § 151, *First.*

The district court initially dismissed the ILA's complaint on jurisdictional grounds, *see International Longshoremen's Association v. National Mediation Board*, 607 F.Supp. 113 (D.D.C.1985), but this court reversed that decision, *see International Longshoremen's Association v. National Mediation Board*, 785 F.2d 1098 (D.C.Cir. 1986). On remand, the district court granted the NMB's motion for summary judgment, and dismissed the ILA's complaint with prejudice, *see International Longshoremen's Association v. National Mediation Board*, C.A. No. 82–2216 (D.D.C. April 25, 1988). The district court found that "[i]mplicit in the Board's decision is its conclusion that the 'common control' criterion means something more substantial than simple subservience to the same sovereign." Memorandum Opinion ("Mem. op.") at 7. The ILA filed a timely appeal.

## II.

We cannot agree with the district court that the NMB adequately addressed the "common control" issue. The Board found that SPA did not control the PRC and that both of them were independent state agencies, *see* 9 N.M.B. at 409. After reading the Board's opinion, however, we cannot say that the Board considered the argument that even though SPA and PRC were independent of each other, both were controlled by the State of North Carolina, and thus SPA was "under common control with" a carrier. If the Board did contemplate such a possibility, its opinion does not reveal it. The basis for an administrative decision, of course, must be clear enough to permit effective judicial review. "It will not do for a court to be compelled to guess at the theory underlying the agency's action," *Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *see Hall v. McLaughlin*, 864 F.2d 868, 873 (D.C.Cir.1989) (noting that agency explanation must "be sufficient to permit the court to discern the path [the agency]

has taken"). Whatever deference is owed to the Board under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed. 2d 694 (1984), is not due when the NMB has apparently failed to apply an important term of its governing statute. We cannot defer to what we cannot perceive.

NMB points to a number of indications that it had the common control test in mind when it rendered its decision. It notes, for example, that in the statement of the parties' contentions at the beginning of its opinion, NMB referred to a denial by SPA that "the Ports Authority or Railway Commission are under common control." 9 N.M.B. at 400. The NMB also maintains that since the parties had raised the common control test in their briefs and in previous proceedings before the Board, this court can infer that the NMB must have been aware of the common control test when it made its decision. In addition, the NMB asserts that it had notified the parties, in a previous notice of hearing, that the common control issue would be one of the subjects of its decision. Even taken together, however, these facts do not establish that the NMB actually considered the common control test in its decision; there is, after all, no *mention* of the common control test in the sections of the opinion entitled "Findings of Fact," "Discussion," or "Conclusion." The Board, moreover, must do more than "implicitly" apply the terms of the Act; it must articulate the reasons for its decisions in a manner that enables a reviewing court to discern the basis for its actions. We find that in this case the NMB's failure to analyze explicitly the common control test as it applies in this case "frustrate[s] effective judicial review." *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam).

Finally, the NMB contends that a prior case, *South Carolina Ports Authority*, 5 N.M.B. 327 (1969), whose facts are remarkably similar to those of the instant case, disposes of the common control issue altogether. The South Carolina Ports Authority owned and operated terminal railroads, and in an initial decision in 1969, the Board found that it qualified as a carrier. *See South Carolina State Ports Authority*, 5 N.M.B. 265 (1969). On November 30, 1972, the South Carolina Ports Authority filed a motion for rehearing and a motion to dismiss for lack of jurisdiction the ILA's application to represent the employees, on the ground that intervening developments had invalidated the NMB's earlier decision. Late in 1969, South Carolina had created the South Carolina Public Railways Commission, and directed the Ports Authority to transfer all control over the terminal railroads to the newly formed Commission. *See South Carolina State Ports Authority*, 5 N.M.B. 327, 329 (1974). The South Carolina Ports Authority "alleged that there was now [a] lack of common control of the terminal railroads in the South Carolina State Ports facility by the Ports Authority." 5 N.M.B. at 327. The NMB summarized the contentions of the Ports Authority:

> Conceding that there may have been "common control" of the terminal railroads in 1969, the Ports Authority contended that no such common control exists at the present time. Therefore, the Ports Authority has contended that the Board should adhere to the doctrine of *Harris County Houston Ship Channel Navigation District*, NMB File No. C–3865. In *Harris County*, the Board found Railway Labor Act jurisdiction to be lacking where the Navigation District was not under "common control with" the Port Terminal Railroad Association, an entity clearly subject to the Railway Labor Act, which entity controlled and directed the operation of the terminal railroads at the Houston Port facility.

5 N.M.B. at 329. The NMB then outlined ILA's version of the "common control" test:

> The ILA further contends that the Ports Authority and the Public Railways Commission are both under common ownership and common control by the State of South Carolina and thus the employees continue to be subject to the jurisdiction of the NMB and the Railway Labor Act.

5 N.M.B. at 329. The NMB concluded, without specifically referring to either party's formulation of the common control test:

> In view of the complete legal divestment of ownership and control of the Ports Authority over the common terminal rail carriers, effected through action by the South Carolina State Legislature and the Interstate Commerce Commission, the National Mediation Board now finds no basis for asserting jurisdiction over any employees of the South Carolina Ports Authority.

5 N.M.B. at 330. The ILA did not appeal the NMB's decision.

The NMB now contends that *South Carolina* defined the "common control" test narrowly as a matter of statutory interpretation, and by finding that "[t]he facts and circumstances of the present case are virtually identical to those in *South Carolina,*" 9 N.M.B. at 402, the Board obviated the need to discourse at length upon the application of the common control test in the instant case.

We disagree. The Board in *South Carolina* committed the same error as it did in the case *sub judice:* it failed to explain adequately the basis of its decision. There is nothing in the *South Carolina* decision analyzing either party's construction of the common control test, or shedding light on the NMB's own views. If anything, the Board's *South Carolina* opinion seems to equate "under common control with" with "control by." This would be an obvious misreading of the statutory language, for it collapses the first phrase of section 1, *First* ("directly or indirectly owned or controlled by") into the second ("under common control with").

Additional explanation is especially necessary because in other situations quite similar to the case *sub judice,* the Board has applied the "common control" test to state agencies and found carrier status. *See, e.g., United States v. Feaster,* 410 F.2d 1354 (5th Cir.), *cert. denied,* 396 U.S. 962, 90 S.Ct. 427, 24 L.Ed.2d 426 (1969):

> The Mediation Board, as noted earlier in the opinion, found that the Terminal Rail-road was concededly a "carrier" and that the State of Alabama controlled both the Docks Department and the Terminal Railroad. Since the Docks Department was "under common control with [a] carrier by railroad," the Mediation Board reasoned that the Docks Department was a "carrier."

410 F.2d at 1369. Such a conclusion and holding by NMB is in direct conflict with its present position. We cannot accept the conclusion of the Board in the instant case without further exposition and reconciliation of its views on the common control test. NMB is entitled to deference on whichever reasonable interpretation of the statute it clearly enunciates and applies. A reviewing court can have zero tolerance of a statutory interpretation that wiggles and waffles from case to case and is never clearly staked out by the agency administering the statute.

### III.

We reverse the district court's decision and remand this case to the district court, with the instruction that it be sent back to the Board for further consideration of the common control test. We emphasize that we do not endorse any particular view of the common control test; that is a matter entrusted to the Board's expertise, and we reject the suggestion of the parties that we decide this case as a matter of law. We point the NMB's attention to a recent decision by PRC to lease its operating facilities to private corporations, *see* 51 Fed.Reg. 36,325 (1986). This, as well as the unique problems posed by the application of the common control test to state-controlled entities, *see* Mem. op. at 7, are both topics for the NMB's reasoned, articulated, and consistent consideration. The case is remanded for such proceedings.

IT IS SO ORDERED.