LEECO, INC., Petitioner,

v.

Ricky HAYS and Federal Mine Safety and Health Review Commission, Respondents.

No. 91–1302.

United States Court of Appeals, District of Columbia Circuit.

Argued May 5, 1992.

Decided May 29, 1992.

As Amended June 3, 1992.

Timothy Joe Walker for petitioner Leeco, Inc. in No. 91–1302, and respondent Leeco, Inc. in No. 91–1276.

Tony Oppegard for respondent Ricky Hays in No. 91–1302, and petitioner Ricky Hays in No. 91–1276.

L. Joseph Ferrara entered an appearance for respondent Federal Mine Safety & Health Review Com'n in No. 91–1276.

Before WALD, STEPHEN F. WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

A mine operator violates federal law if it discharges a miner in retaliation for the miner's good faith refusal to perform work he reasonably believes to be unsafe. Congress deliberately chose to promote mine safety by protecting a miner's right to refuse unsafe work even though the operator's right to make personnel decisions is

infringed thereby. This case raises the novel question whether a miner must first tell his employer that he will not perform the allegedly dangerous work before he can invoke the federal protection against discharge.

Ricky Hays was fired from his job as a miner with the Leeco mining company because he failed to perform one part of his job. An Administrative Law Judge ("ALJ") of the Federal Mine Safety & Health Review Commission ("FMSHRC" or "Commission") decided that Hays, who had unsuccessfully complained to his supervisor about the danger of that part of the job, was protected under section 105(c) of the Mine Act, 30 U.S.C. § 815(c)(1), because he reasonably and in good faith believed the task to be unsafe, even though he did not bring to his employer's attention the additional fact that he was not performing the work. The Commission elected not to exercise its discretion to review the ALJ's decision, thus allowing it to become a final decision. We now remand the case to the Commission for further consideration and a more adequate explanation of how section 105(c) can be interpreted to protect Hays's conduct. Our decision on the merits today means that we do not reach Hays's petition, which contests the ALJ's reduction of Hays's attorney's fees.

## I. BACKGROUND

Ricky Hays was employed as an electrician with the Leeco mine company for about two years. Part of Hays's responsibilities included greasing the continuous haulage system [1] ("system") in mine No. 62 at the Leeco site in Perry County, Kentucky. It is undisputed that greasing the system while it is running is hazardous and subjects the miner to substantial risk of losing life or limb.[2] Federal safety regulations mandate that greasing and oiling the system be performed only while the system is not in operation. See 30 C.F.R. §§ 75.-509, 75.1725 (1991).

Although Leeco expected Hays to grease the system completely during each of his shifts, the company never took the machine out of operation in order for him to service it safely. On occasion, Hays was able to grease the system while it was inert because of unplanned work stoppages (due to breakdowns, etc.), but usually the system operated continuously during Hays's shift. In order to do his job, Hays was thus routinely required to risk his life and limb in violation of federal mine safety regulations.

Hays complained several times to Clayton Hacker, the maintenance foreman, about the dangers of greasing the system while in operation.[3] Hacker responded that Leeco would not take the machine out of operation simply to allow greasing, and told Hays that if he did not do all of his job, he would be replaced by someone who would. At one point Hays even asked for permission to work overtime after his shift had concluded in order to grease the sys-

1. A continuous haulage system carries coal from the mining face to the conveyor belt, which takes the coal out of the mine. The system consists of a series of bridges and mobile bridge carriers. The carriers are crawler-mounted, self-propelled machines, each with its own operator, which follow the continuous miner as it cuts coal from the face and advances into the mine.

2. In order to grease the system, Hays had to attach the grease hose to fittings located at different places on the machine. Then, while holding the hose in one hand, Hays would pump the grease gun with the other hand. Some of the grease fittings on the system were located within six inches of the mine floor, which meant that Hays had to kneel—with his cap light pointed toward the floor—in order to reach them. This routine impaired Hays's visi-

bility as well as his awareness of sudden movements of the machine, and increased the likelihood of his being run over by the mobile bridge carrier. Hays also had to lie on top of the system's mobile bridge carriers while they were in motion in order to grease fittings in those components' grease block. Because his cap light was pointed down toward the block, this maneuver also impaired his vision and awareness and created a risk of his being crushed against the rib of the mine or the roof.

3. Some of Hays's safety-related complaints to Hacker occurred while both men worked in the Leeco mine No. 49 in Leslie County, Kentucky. Hays had the same responsibilities in mine No. 49 as he later had in mine No. 62, and Hacker was his supervising foreman in both Leeco mines.

tem during "down time." Hacker refused this request.

Despite his concerns, Hayes continued to grease most of the fittings on the system. There were several fittings, however, that he did not grease while the machine was operating. These fittings were "offset" rather than centered on the shafts of the machine, which caused the fitting to rotate unevenly as the shaft turned while the machine was running. The uneven rotation made it extremely difficult to attach the grease hose to the fitting, and increased the possibility that Hays would be knocked over by the machine or crushed against the rib of the mine.

On September 7, 1989, the continuous haulage system broke down because of a mechanical failure (unrelated to Hays's failure to grease the offset fittings). Clyde Collins, the mine superintendent, examined the system while it was being repaired and noticed that one of the shafts with an off-set fitting—the speed reducer shaft—had not been greased. Collins asked Hays about it, and Hays admitted that he had not greased that shaft for five days, explaining that it was too dangerous to do so while the system was in motion.

Later that same day, Hays was summoned to meet with Hacker, his immediate supervisor. During that meeting, Hays again told Hacker about the extreme dangers of greasing the offset fittings while the machine was running and explained that he had not greased the speed reducer shaft during the previous five days for that reason. Hacker told Hays that Leeco could accept no excuses for his omission and informed him that he was being terminated from his job.

One week later Hays filed a complaint with the Mine Safety and Health Administration ("MSHA") under section 105(c) of the Mine Act, which prohibits a mine operator from discriminating against a miner because the miner has engaged in protected, safety-related conduct.[4] The MSHA investigated Hays's complaint, and on November 7, 1989, notified Hays that it had determined that Leeco had not violated the Act by its dismissal of Hays. Hays then filed a complaint on his own behalf with the FMSHRC pursuant to Section 105(c)(3) of the Mine Act,[5] and the Commission subsequently ordered the case to be heard before an ALJ.

The ALJ issued a decision finding that Hays's failure to grease the offset fittings while the system was in operation constituted a "work refusal" which was motivated by reasonable safety concerns. *Hays v. Leeco, Inc.,* 12 F.M.S.H.R.C. 1850 (1990). The ALJ concluded that Hays had been fired because of his failure to grease the speed reducer shaft. Because Leeco had fired Hays for what the ALJ found to be a work refusal and a protected activity under the Act, the ALJ ordered that Hays be reinstated and awarded back pay. In a later decision the ALJ awarded Hays attorney's fees, although he rejected or reduced *sua sponte* certain amounts requested by Hays. *Hays v. Leeco, Inc.,* 13 F.M.S.H.R.C. 670 (1991). The FMSHRC declined discretionary review of both of the ALJ's decisions, and they became final Commission decisions. Leeco filed a petition in this court to review the decision finding Leeco in violation of section 105(c)

4. Section 105(c)(1) of the Act provides, in relevant part:

No person shall discharge or ... cause to be discharged ... or otherwise interfere with the exercise of the statutory rights of any miner ... because such miner ... has filed or made a complaint under or related to this Act, including a complaint notifying the operator ... of an alleged danger or safety or health violation in a coal mine.

30 U.S.C. § 815(c)(1) (1988).

5. Sections 105(c)(2) and (3) of the Act provide, in relevant part:

Any miner ... who believes that he has been discharged ... by any person in violation of [section 105(c)(1)] may ... file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall cause such investigation to be made as he deems appropriate.... If the Secretary, upon investigation, determines that the provisions of this subsection have not been violated, the complainant shall have the right ... to file an action in his own behalf before the Commission charging discrimination ... in violation of [section 105(c)(1)]. *Id.* § 815(c)(2), (3) (1988).

of the Mine Act. Hays filed a petition seeking review of the ALJ's decision to reduce or reject *sua sponte* his attorney's fees request. This court then consolidated the two cases.

## II. DISCUSSION

■ In order to establish a prima facie case of discrimination under section 105(c) of the Mine Act, a complaining miner must prove that (1) he was engaged in protected activity and (2) that the adverse action complained of was motivated in some part by that activity. *See Donovan ex rel. Chacon v. Phelps Dodge Corp.*, 709 F.2d 86, 88 (D.C.Cir.1983); *Secretary ex rel. Jenkins v. Hecla–Day Mines Corp.*, 6 F.M.S.H.R.C. 1842 (1984); *Secretary ex rel. Robinette v. United Castle Coal Co.*, 3 F.M.S.H.R.C. 803 (1981). Leeco does not challenge the ALJ's findings that Hays was fired because of his failure to grease the system while it was in operation and that Hays was justified in believing that it was dangerous to perform that part of his required work. Leeco does challenge the ALJ's legal conclusion that Hays's failure to grease the system without bringing that fact to the attention of his supervisors qualified as a "refusal" under the work refusal doctrine.[6]

■ Under the Commission's settled interpretation of section 105(c), a miner has the right to refuse to perform work which he reasonably believes poses a safety hazard. *See Gilbert v. FMSHRC*, 866 F.2d 1433, 1439 (D.C.Cir.1989); *Simpson v. FMSHRC*, 842 F.2d 453, 458 (D.C.Cir.1988); *Secretary ex rel. Bush v. Union Carbide Corp.*, 5 F.M.S.H.R.C. 993, 997 (1983); *Robinette*, 3 F.M.S.H.R.C. at 807–12. In endorsing that interpretation, this court has noted that "the legislative history of the statute unequivocally supports the Commission's view" that a miner's refusal to perform work he reasonably believes to be unsafe is a protected activity. *Simpson*,

842 F.2d at 458. *See also* S.REP. No. 181, 95th Cong., 1st Sess. 35 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3435 ("Committee intends the scope of protected activities to be broadly interpreted . . . and intends it to include . . . the refusal to work in conditions which are believed to be unsafe").

The ALJ determined here that Hays's failure to grease the speed reducer shaft fit within the Commission's "work refusal" doctrine even though Hays did not tell the operator in advance that he was refusing to perform the work. So far as we can tell, in all prior Commission and court decisions upholding a miner's right to refuse unsafe work, the miner has expressly or implicitly made his employer aware of the fact that he would not continue to perform his assigned task. *See, e.g., Gilbert*, 866 F.2d at 1439; *Simpson*, 842 F.2d at 458; *Price v. Monterey Coal Co.*, 12 F.M.S.H.R.C. 1505 (1990); *Secretary ex rel. Hogan & Ventura v. Emerald Mines Corp.*, 8 F.M.S.H.R.C. 1529 (1983); *Secretary ex rel. Pratt v. River Hurricane Coal Co.*, 5 F.M.S.H.R.C. 1529 (1983); *Bush*, 5 F.M.S.H.R.C. at 997; *Haro v. Magma Copper Co.*, 4 F.M.S.H.R.C. 1935 (1982); *Secretary ex rel. Dunmire & Estle v. Northern Coal Co.*, 4 F.M.S.H.R.C. 126 (1982); *Robinette*, 3 F.M.S.H.R.C. at 807. Leeco does not dispute and indeed the law is clear that Hays's conduct would have been fully protected had he simply let Hacker know that he was not greasing all of the fittings on the system. That, however, is not the scenario of this case.

■ Although the ALJ correctly identified the crucial issue: whether "Hays's surreptitious failure to service the grease fitting on the speed reducer shaft . . . constitute[d] a valid work 'refusal' protected by the Act," *Hays v. Leeco*, 12 F.M.S.R.H.C. at 1880, he did not provide us with a satisfactory explanation as to why the Act should be extended beyond prior

---

**6.** Leeco also contends that the ALJ erred by allowing an expert witness to testify about the safety concerns related to greasing the system. We find no abuse of discretion, given the witness's extensive experience as a safety inspector and his familiarity with federal mine safety

regulations. Moreover, a substantial amount of other evidence, including testimony of Leeco's own witnesses, established beyond any doubt that it was hazardous to grease the system while it was in operation. Any error regarding the expert's testimony would therefore be harmless.

interpretations to cover such covert conduct. Despite persistent complaints, Hays did not "refuse" to work in any traditional sense of the word; rather, he acted in a manner to lead the employer to think he was doing his job, despite his protests. However distasteful we may find Leeco's insistence that Hays perform unsafe work, we are not able simply to dismiss its argument that the safety-related purpose of section 105(c) is not advanced, and indeed may be undercut, by a miner's unannounced failure to perform an unsafe task which, at least in some cases, if not this one, may expose other workers to hazardous work conditions before the miner's failure is discovered. *Cf. Miller v. FMSHRC*, 687 F.2d 194, 196–97 (7th Cir.1982). On the record before us, we are unable to sustain the ALJ's conclusion that such a concealed stoppage is protected by the Act. We require a reasoned decision, whether supplied by the Commission itself or through its approval of the adequate reasoning of an ALJ. Section 105(c) was designed to ensure miners' active participation in enforcing the Act's safety policies, *see, e.g.,* S.REP. No. 95–181, *supra;* it is far from clear at this juncture how the ALJ's decision promotes that goal.

The ALJ's conclusion that Hays engaged in protected activity was apparently based on the fact that Hays's complaints had proved futile in the past and that he had been threatened with firing if he did not perform the dangerous task. In the ALJ's view, his subsequent failure to perform his job amounted to the same thing as a communicated refusal because Leeco was already aware of his safety-related complaints. Even if this was a defensible construction of section 105(c), it obviously represented a significant extension of, if not a departure from, pre-existing law and requires some explanation from the Commission. Although extension of the work refusal doctrine to cover this case appears consistent with previous understandings of the rule in the way it affects mine *operators'* incentives to pay attention to their employees' safety protests, the extension has a very different effect on incentives for *miners,* which requires careful assessment by the Commission.

The Mine Act does not tell us specifically whether Hays's conduct was protected; so "we generally need ask only whether the FMSHRC's interpretation is 'rational and consistent with the statute,'" *see NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 114, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Judicial deference under *Chevron* to an agency's interpretation, however, cannot occur in a vacuum. In the absence of any explanation justifying as within the purposes of the Act the expansion of the work refusal doctrine to cover situations where no communication of the refusal has occurred, we are unable to sustain the Commission's decision as "reasonably defensible." *See Simpson,* 842 F.2d at 458. It is especially important in cases where the agency has taken a sharp turn from prior holdings that its actions be supported by reasoned decision-making, *see Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).

### III. CONCLUSION

We therefore grant Leeco's petition for review and remand this case to the FMSHRC for reconsideration and, if appropriate, an explanation of how Hays's conduct qualifies as a protected activity under section 105(c) of the Mine Act.[7]

*It is so ordered.*

---

7. Because Hays may collect attorney's fees only if he succeeds in his discrimination suit, we need not address at this time his petition to review the ALJ's decision reducing his attorney's fees request. That petition shall be held in abeyance pending completion of the FMSHRC

decision on remand; either party shall file with this court an appropriate motion (to reactivate or dismiss Hays's attorney's fees appeal) within thirty days of the Commission's final decision.