## OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, AFL–CIO, Petitioner

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

### TNS, Inc., Intervenor.

### No. 93–1299.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 30, 1994.

Decided Feb. 14, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied April 24, 1995.

---

George H. Cohen, argued the cause for petitioner. With him on the briefs were Jeremiah A. Collins and Susan L. Carney.

John H. Fawley, Atty., N.L.R.B., argued the cause for respondent. With him on the brief were Howard E. Perlstein, Deputy Asst. Gen. Counsel, Linda R. Sher, Acting Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel.

On the brief for intervenor were Robert L. Thompson, William M. Earnest and Nancy F. Reynolds.

Douglas S. McDowell, entered an appearance for amicus curiae Labor Policy Ass'n.

Mona C. Zeiberg, entered an appearance for amicus curiae Chamber of Commerce.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

The underlying question in this case is whether employees who engage in a strike, which allegedly began as a protest over "abnormally dangerous" working conditions within the meaning of section 502 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 143 (1988), should be deemed unfair labor practice strikers, in which case the employer would violate the National Labor Relations Act ("Act" or "NLRA"), 29 U.S.C. § 158(a)(1), (3) (1988), by hiring permanent replacements. In dismissing the complaint at issue, over the dissent of one member, the Board's decision was supported by a two-member plurality opinion and a one-member concurrence. We find, however, that the concurring opinion is founded on a construction of section 502 that is wrong as a matter of law. We are confronted, then, with a situation in which the result reached by the Board is not supported by defensible opinions from a majority of its members. Because the Board's position on the underlying substantive issue cannot be discerned, we are constrained to remand the case for further proceedings.

The initiating charges in this case were filed in 1981 and 1982 by the Oil, Chemical and Atomic Workers International Union, AFL–CIO ("OCAW" or "Union"), against TNS, Inc., for alleged unfair labor practices. The Union claimed that TNS violated sections 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1), (3), when the company permanently replaced a number of bargaining unit employees engaged in a prolonged work stoppage, allegedly precipitated by working conditions perceived to be "abnormally dangerous" by the workers. A divided NLRB dismissed the Union's unfair labor practice charges, ruling that the strike was not a section 502 work stoppage and that, because the employees were economic strikers, TNS had lawfully hired permanent replacements.

Faced for the first time with applying section 502 to the occupational hazards of the nuclear industry, the two-member plurality and the concurring member developed separate tests for demonstrating section 502 coverage in the context of employee exposure to radioactive or toxic substances. The plurality determined under its test that, when the employees ceased working, they did not reasonably believe that working conditions at TNS's plant were "abnormally dangerous" under section 502. The concurrence found section 502 inapplicable because the disputed health and safety conditions, even if abnormally dangerous, were not the "sole cause" of the work stoppage. *See TNS, Inc.,* 309 N.L.R.B. 1348, 1348–71 (1992) ("NLRB Decision"). The Union now petitions for review of the Board's decision.

Because we conclude that the "sole-cause" test developed by the concurring Board member is clearly an impermissible construc-

tion of section 502, we are left with only the plurality's interpretation of that section, which is supported by less than a Board majority. As a result, we are unable to discern the policy of *the Board* in a case in which the entire Board purported to address the underlying issue.[1] We therefore hold that the Board has not adequately articulated its policy in this case and that its decision is thus not properly reviewable in this court.

## I. BACKGROUND

### A. *Factual Background*

TNS, Inc., an intervenor in this appeal, operates a plant in Jonesboro, Tennessee. In 1981, when the present dispute arose, TNS produced various forms of ammunition made from depleted uranium ("DU"). Approximately one-hundred employees of TNS were members of the bargaining unit represented by the Union. The collective bargaining agreement between OCAW and TNS was effective through April 30, 1981.

DU dust particles present in TNS's manufacturing process posed hazards to its employees as both a carcinogenic and chemically toxic material. The inhalation or ingestion of these radioactive particles exposed internal tissues to the cancer risks associated with cumulative, low-level radiation and were a toxic threat to the kidneys. As a result, TNS's plant was subject to the jurisdiction of the United States Nuclear Regulatory Commission ("NRC"). Pursuant to an agreement between the NRC and the State of Tennessee, the Tennessee Division of Radiological Health ("TDRH") was responsible for licensing Tennessee nuclear facilities and for promulgating regulations designed to protect workers from occupational hazards in such facilities.[2] TDRH also inspected subject facilities to ensure compliance with its safety standards and had authority to close a facility through license suspension or revocation. As part of its oversight authority over

TDRH, NRC officials periodically accompanied TDRH officials during plant inspections.

In order to comply with TDRH regulations, TNS utilized a physical engineering airborne contaminant control system to eliminate DU dust particles at their source. Because the escape of some radiation into the work environment is inevitable, TDRH also adopted standards for the maximum permissible concentration ("MPC") of airborne DU particles. MPC represents the amount of airborne radioactive material beyond which no worker is to be exposed for 40 hours per week for 13 weeks. TDRH regulations required licensees, to the extent practicable, to keep airborne contaminant levels below 25% of MPC. If an employer's engineering system was unable to achieve such levels, TDRH authorized the use of respirators to protect employees. In that event, TDRH required that employers conform to NRC guidelines governing the safe use of respirators.

In September 1979, TDRH began regular, semiannual inspections of the TNS plant. These inspections revealed a number of areas of noncompliance with TDRH regulations at the TNS plant, which TDRH instructed TNS management to rectify. In January 1981, in response to airborne contamination levels at the plant in excess of MPC, as well as a number of employee urine samples with a uranium content in excess of TNS's own safety standards, TNS instituted a mandatory program of continuous, full-time respirator use for employees in various sections of the plant. TNS intended to maintain the program until the following August, when it planned to install new ventilating and shielding equipment. Various aspects of the respirator program, however, were carried on in violation of TDRH regulations.

During the winter of 1980/1981, relations between the Union and TNS management became increasingly strained over the health and safety conditions at the plant. As early

1. At the time when this case was decided by the NLRB, there were only four members on the Board.

2. The agreement between the NRC and Tennessee was subject to termination or suspension if the NRC determined that such action was neces-

sary to protect the public health and safety or that the state failed to comply with any requirement set forth in the Atomic Energy Act's provision providing for state agreements. *See* 42 U.S.C. § 2021(j)(1) (1988).

as October or November of 1980, employees had expressed a desire to strike to protest health and safety conditions. The Union had advised against such a strike, however, explaining that employees would jeopardize their jobs if they struck before the collective bargaining agreement, which contained a no-strike clause, expired. On March 10, 1981, the Union informed TNS that bargaining unit employees would not return to work after the April 30 expiration of the contract until TNS corrected the safety problems discovered by TDRH's past inspections, as well as any violations discovered during its upcoming April inspection. Also in March, a number of plant employees had engaged in a wildcat strike to protest the respirator program, but the Union persuaded them to return to work.

Negotiations between the Union and TNS over a successor contract were unsuccessful. Agreement could not be reached in a number of areas, including health and safety. On May 1, 1981, bargaining unit employees began a work stoppage at the TNS plant. Subsequent negotiations between TNS and the Union, which primarily focused on health and safety issues, also yielded no agreement. Inspections by TDRH and federal officials in the summer and fall of 1981, after TNS employees had begun their work stoppage, revealed that employee exposure levels at the TNS plant, while substantially higher than nuclear industry norms, were generally within legal limits. See NLRB Decision, 309 N.L.R.B. at 1350–55. After closing down operations for several months, TNS hired permanent replacements for the "striking" workers. This action, as well as TNS's subsequent refusal to bargain with the Union after TNS's replacement employees voted to decertify OCAW as their exclusive representative, prompted the Union to file unfair labor practice charges with the NLRB.

■ The Union charges to the Board alleged, inter alia, that the permanent replacement of workers engaged in a work stoppage under section 502 of the LMRA violated sections 8(a)(1) and 8(a)(3) of the NLRA. Section 502 provides that the good faith "quitting of labor" because of abnormally dangerous working conditions shall not be deemed a "strike" under the Act. 29 U.S.C. § 143. Under established principles of labor law, workers who strike in response to an employer's unfair labor practices normally may not be permanently replaced. See, e.g., Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 279–84, 76 S.Ct. 349, 356–59, 100 L.Ed.2d 309 (1956). Under the Union's theory of the case, workers who engage in a work stoppage pursuant to section 502 should be deemed the equivalent of unfair labor practice strikers, in which case TNS would have violated the Act by hiring permanent replacements. In August of 1982, the NLRB's General Counsel adopted the Union's theory and brought an unfair labor practice complaint against TNS. See Complaint and Notice of Hearing, reprinted in Joint Appendix 726.

B. The Board's Decision

The hearing before the Administrative Law Judge ("ALJ") began in November 1983 and concluded in April 1985. In a 161–page decision, the ALJ first found that the TNS employees had engaged in their work stoppage pursuant to section 502. The ALJ stated that, under controlling precedent, employees seeking to obtain the protections of section 502 must prove (1) that they believed in good faith that their working conditions were abnormally dangerous and that this belief caused the work stoppage; (2) that ascertainable, objective evidence supports the reasonableness of the employees' belief; and (3) that the dangers were greater than those which normally existed in the work place and posed a presently existing threat affecting all who engaged in the work stoppage. See NLRB Decision, 309 N.L.R.B. at 1435 (reprinting ALJ decision). Concluding that the TNS employees satisfied these standards, the ALJ next found that employees who engage in a section 502 work stoppage enjoy "special protections" akin to those provided unfair labor practice strikers. Id. at 1454. Accordingly, the ALJ held that TNS's permanent replacement of and refusal to reinstate the bargaining unit employees violated sections 8(a)(1) and (3) of the NLRA.

Called upon for the first time to apply section 502 in the context of occupational

exposure to low-level radiation, a divided NLRB reversed the ALJ's ruling and dismissed the complaint. The two-member plurality opinion found that, at the time TNS's employees ceased working, they did not reasonably believe that working conditions were abnormally dangerous within the meaning of section 502. *Id.* at 1359–61. Accordingly, the plurality held that the employees were economic strikers and that TNS had lawfully hired permanent replacements. *Id.* at 1365–66.

In construing section 502, the plurality turned to Supreme Court and Board precedent for guidance, because "neither Section 502 nor its legislative history offers any definition of 'abnormally dangerous.'" *Id.* at 1356. Based upon Board precedent and the Supreme Court's decision in *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 386–87, 94 S.Ct. 629, 640–41, 38 L.Ed.2d 583 (1974), the plurality developed a two-part test for parties "attempting to demonstrate Section 502 coverage in the context of employee exposure . . . to radioactive and/or toxic substances." NLRB Decision, 309 N.L.R.B. at 1357. Noting that section 502 is a limited exception to the rules governing strikes,[3] the plurality initially stated that its test imposes a heavy burden of objective proof on employees. The test requires employees seeking to invoke section 502 to show that they

> reasonably believed, on the basis of objective evidence, *either* (1) that inherently dangerous conditions in the subject workplace had changed significantly for the worse, so as to impose a substantial threat of imminent danger if exposure were continued at the time the employees began to withhold their services, *or* (2) that the cumulative effects of exposure to those substances had reached the point at which

any further exposure would pose an unacceptable risk of future injury to employees. *Id.* at 1357–58 (footnote omitted).

The plurality explained that the first part of its test reflects the rationale that, absent the emergence of circumstances that change the character of the danger normally faced by employees, inherently dangerous working conditions do not become abnormally dangerous merely because employees no longer wish to accept those same dangers. *See id.* at 1358 (citing *Anaconda Aluminum Co.*, 197 N.L.R.B. 336, 344 (1972)). The plurality further stated that, in accord with Board precedent, "the appropriate benchmark of normalcy for evaluating the claim of abnormal danger is set by the prevailing conditions at the TNS plant, rather than by conditions in the nuclear industry at large or in the industrial subgroup of employees working with DU." *Id.* (internal quotations omitted). The plurality then concluded that the first part of its test had not been satisfied in this case because, "[i]n the few months preceding the work stoppage, there were no significant new . . . circumstances changing the character of the prevailing danger involved in working at the TNS plant." *Id.* In reaching that conclusion, the plurality noted that both the Union and employees had complained about health and safety conditions at the plant for several months and yet had not walked off the job. The plurality found that these actions were inconsistent with a reasonable belief that abnormally dangerous working conditions existed at the plant. *See id.* at 1359.

The second part of its test, the plurality explained, was intended to allow for the possibility that employee exposure to radioactive substances may build over time to a point where further exposure would pose unacceptable health risks, notwithstanding the fact that no material change in working conditions may have occurred.[4] *See id.* at 1358.

---

3. Section 502 provides in relevant part:
   [N]or shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this [Act]. 29 U.S.C. § 143. The Supreme Court has stated that "[t]his section provides a limited exception to an express or implied no-strike obligation." *Gateway Coal*, 414 U.S. at 385, 94 S.Ct. at 640.

4. In a footnote, the plurality also "allow[ed] for the possibility of exceptional circumstances in which the place of employment presents abnormally dangerous conditions that are evident virtually from the time that employees begin work there." NLRB Decision, 309 N.L.R.B. at 1358 n. 36.

In determining whether that threshold has been reached, the plurality stated that it would give "substantial weight" to the actions and assessments of the agencies "charged ... with the responsibility for monitoring radiation hazards in plants such as TNS." *Id.* at 1360. Thus, based largely on the fact that TDRH and the NRC had never indicated that conditions at the TNS plant were so unsafe as to require removal of employees at the time of the walkout, or even considered taking such action, and that there was no evidence that those agencies had failed to carry out their regulatory responsibilities in an appropriate manner, the plurality found that the danger threshold of the second part of its test had not been met. *See id.* at 1360–61.

One Board member concurred in the judgment dismissing the Union's complaint, but on grounds that were significantly divorced from the plurality opinion. In fact, the concurrence strongly criticized the plurality's test, claiming that it imposed "unrealistic barriers" to showing abnormal danger in the context of occupational exposure to unsafe levels of radiation. *Id.* at 1368. The concurrence agreed with the plurality that the employees' walkout was not protected by section 502, but on the narrower ground that health and safety conditions at the TNS plant, even assuming that they were abnormally dangerous, were not the "sole cause" of the work stoppage. *See id.* In developing a "sole-cause" test, the concurrence relied on both the language of section 502 and a statement in *Gateway Coal.* The concurrence first noted that, in order to fall within the compass of section 502, a work stoppage must occur "because of" abnormally dangerous working conditions. 29 U.S.C. § 143. Thus, the concurrence stated, there must be a causal connection between the abnormally dangerous conditions and the work stoppage. *See* NLRB Decision, 309 N.L.R.B. at 1368. The concurrence then pointed to the Supreme Court's statement in *Gateway Coal* that "a work stoppage called solely to protect employees from immediate danger is authorized by § 502." 414 U.S. at 385, 94 S.Ct. at 640. From this statement, the concurrence concluded that a work stoppage is covered by section 502 only if abnormally dangerous

working conditions are the "sole cause" of the walkout. Finding that the work stoppage was caused, "at least in part, by a desire to achieve a satisfactory collective bargaining agreement, rather than solely by a reaction to abnormally dangerous conditions in the plant," NLRB Decision, 309 N.L.R.B. at 1370, the concurrence concluded that section 502 did not apply in this case.

Because both the plurality and the concurrence found that section 502 did not apply in this case, neither opinion reached the issue of whether employees who stop working pursuant to section 502 should be protected from permanent replacement. Member Devaney, in dissent, would have sustained the Union's complaint in its entirety. *See id.* at 1371–88.

## II. ANALYSIS

On petition for review, the Union raises a number of challenges to the Board's decision. We need not reach most of these issues, however, for we find one to be dispositive. Because we find that the concurring member's "sole-cause" test is wrong as a matter of law, we are left with a plurality test supported by only two of four Board members. Normally, the Board's construction of the Act is subject to deferential review under *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); the problem here is that the *Board's* position is unfathomable. A majority of the Board agreed on a result, but the plurality, concurring, and dissenting opinions have no other common ground (and the concurring opinion is patently meritless). In this circumstance, where the result hinges on the Board's definition of the underlying legal right at issue, we will not defer to the Board's disposition because we cannot comprehend a basis for the result reached.

### A. Applicable Legal Principles

As the Supreme Court has repeatedly emphasized, "[t]he function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations

Board, subject to limited judicial review." *American Broadcasting Cos. v. Writers Guild*, 437 U.S. 411, 431, 98 S.Ct. 2423, 2434, 57 L.Ed.2d 313 (1978) (internal quotations omitted); *see also NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990) ("This Court has emphasized often that the NLRB has the primary responsibility for developing and applying national labor policy."); *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1249 (D.C.Cir.1994) ("It is up to the Board, not the courts, to make labor policy."). Therefore, courts have accorded considerable deference to policy judgments of the Board. *See Curtin Matheson*, 494 U.S. at 786, 110 S.Ct. at 1549; *Pittsburgh Press Co. v. NLRB*, 977 F.2d 652, 662 (D.C.Cir. 1992) ("We are mindful of the deference we owe the Board's expertise and judgment."). And where a Board policy rests on a construction of an ambiguous provision in the Act, we must uphold that construction so long as it is "reasonable." *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–83; *accord Hammontree v. NLRB*, 925 F.2d 1486, 1491 (D.C.Cir.1991) (*en banc*).

■ Under the *Chevron* doctrine, "[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." 467 U.S. at 843, 104 S.Ct. at 2782 (internal quotations omitted); *see also National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C.Cir.) ("When Congress leaves gaps ..., either explicitly by authorizing the agency to adopt implementing regulations, or implicitly by enacting an ambiguously worded provision that the agency must interpret, it has explicitly or implicitly delegated to the agency the power to fill those gaps. That delegation requires the courts to defer to an agency's decision about how to exercise its power."), *cert. denied*, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); *Investment Co. Inst. v. Conover*, 790 F.2d 925, 935 (D.C.Cir.) ("The overriding principle is that as long as Congress has no clearly discernable intent on the point in question, it is the agency which is vested with primary responsibility for interpreting the statute. *Chevron* teaches that

Congress may delegate interpretative authority implicitly—by failing to legislate in sufficient detail as to resolve a particular question of interpretation."), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 372 (1986).

The adoption of this unitary principle in *Chevron* represented a dramatic change in the law of judicial review of federal agency decisionmaking. Prior to *Chevron*, courts did not adhere to any one standard in reviewing agency constructions of the statutes they administered. *See* Mark Seidenfeld, A Syncopated *Chevron*: Emphasizing Reasoned Decisionmaking in Reviewing Agency Interpretations of Statutes, 73 Tex.L.Rev. 83, 93 (1994) (referring to pre-*Chevron* doctrine as "schizophrenic"). As Judge Friendly wrote in 1976:

> We think it is time to recognize ... that there are two lines of Supreme Court decisions on this subject which are analytically in conflict, with the result that a court of appeals must choose the one it deems more appropriate for the case at hand. Leading cases support[ ] the view that great deference must be given to the decisions of an administrative agency applying a statute to the facts and that such decisions can be reversed only if without rational basis.... However, there is an impressive body of law sanctioning free substitution of judicial for administrative judgment when the question involves the meaning of a statutory term.

*Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 49 (2d Cir.1976) (footnote omitted), *aff'd sub nom. Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). Indeed, as late as 1984 (the year *Chevron* was decided), this court noted that the case law

> has not crystallized around a single doctrinal formulation which captures the extent to which courts should defer to agency interpretations of law. Instead, two opposing platitudes exert countervailing gravitational pulls on the law. At one pole stands the maxim that courts should defer to reasonable agency interpretive positions.... Pulling in the other direction is

the principle that courts remain the final arbiters of statutory meaning. . . .

*Natural Resources Defense Council v. EPA,* 725 F.2d 761, 767 (D.C.Cir.1984) (internal quotations and citations omitted).

In deciding whether to defer to agency determinations or to substitute their own judgment for that of the agency, pre-*Chevron* courts frequently looked to the relative competence of the agency and the court in deciding the matter in question. For example, courts that accepted reasonable agency interpretations often referred to the agency's expertise, its familiarity with the history and purposes of the legislation at issue, and its practical knowledge of what will best effectuate the purposes of the statute. *See, e.g., NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 130–31, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944); *Process Gas Consumers Group v. United States Dep't of Agric.,* 694 F.2d 778, 791–92 (D.C.Cir.1982) (*en banc*), *cert. denied,* 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 807 (1983). On the other hand, when courts substituted their own interpretations for those of the agencies, they usually did so on the ground that the courts are the final arbiters in matters of statutory interpretation. *See, e.g., Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970); *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 492–93, 67 S.Ct. 789, 793–94, 91 L.Ed. 1040 (1947).

■ In *Chevron,* the Court opted in favor of the line of cases holding that, absent *plain meaning* in a statute, reviewing courts must defer to reasonable agency interpretations of the statutes they are charged with administering. This is not to say that any claimed ambiguity in a statute requires a court to accept any agency action premised on that ambiguity. As we have noted:

[D]eference is warranted only when Congress has left a gap for the agency to fill pursuant to an express or implied "delegation of authority to the agency." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). . . .

To suggest, as the Board effectively does, that *Chevron* step two is implicated

any time a statute does not expressly *negate* the existence of a claimed administrative power . . . , is both flatly unfaithful to the principles of administrative law . . . and refuted by precedent. *See, e.g., Natural Resources Defense Council v. Reilly,* 983 F.2d 259, 266 (D.C.Cir.1993) (" '[I]t is only legislative *intent to delegate* such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron.*' ") (quoting *Kansas City v. Department of Housing & Urban Dev.,* 923 F.2d 188, 191–92 (D.C.Cir.1991)) (emphasis added). Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.

*Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655, 671 (D.C.Cir. 1994) (*en banc*), *cert. denied,* 63 U.S.L.W. 3691 (U.S. March 20, 1995) (94–890), *and cert. denied,* 63 U.S.L.W. 3691 (U.S. March 20, 1995) (94–907). In a case such as this one, however, there can be no doubt that Congress delegated authority to the Board to construe provisions of the NLRA, especially those implicating alleged unfair labor practices. The only question here is whether the Board has articulated a defensible policy.

■ "Judicial deference under *Chevron* to an agency's interpretation . . . cannot occur in a vacuum." *Leeco, Inc. v. Hays,* 965 F.2d 1081, 1085 (D.C.Cir.1992). In order for the reviewing court properly to perform its task under *Chevron,* it must be able to discern the rationale underlying an agency's construction of the statute. *See Acme Die Casting v. NLRB,* 26 F.3d 162, 166 (D.C.Cir.1994); *Leeco,* 965 F.2d at 1085 ("In the absence of any explanation justifying [the agency's position] as within the purposes of the Act . . . , we are unable to sustain the Commission's decision as reasonably defensible.") (internal quotations omitted); *City of Kansas City v. HUD,* 923 F.2d 188, 192 (D.C.Cir.1991) ("[W]here the agency's administrator has failed to provide . . . a reasonable construction to which we can defer, we must remand to the agency for consideration of the statutory question in the first instance."); *International Longshoremen's Ass'n v. National Mediation Bd.,* 870 F.2d 733, 736 (D.C.Cir.1989) (agency's

failure to articulate basis for its decisions "frustrate[s] effective judicial review" because court "cannot defer to what [it] cannot perceive") (internal quotations omitted); *see also United Food & Commercial Workers Int'l Union v. NLRB*, 880 F.2d 1422, 1436 (D.C.Cir.1989) ("[T]he [NLRB] must accept responsibility for clarifying and identifying the standards that are guiding its decisions."). We insist upon such an articulation by *the agency* "to avoid 'propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.'" *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).

Our assessment of an agency's statutory construction becomes more complicated where, as here, we are confronted with a Board ruling that is supported by more than one rationale. For example, in *United Food and Commercial Workers*, 880 F.2d at 1436–37, the NLRB had ruled without explanation that an employer's refusal to bargain over a plant relocation was lawful under any one of three separate tests for determining whether such a decision was a mandatory subject of bargaining, each of which had been articulated in a previous Board decision. *Id.* Notwithstanding the reasonableness of the three separate tests, the court held that the Board's failure to articulate which test it was relying on, or, at a minimum, to explain how the same result could be reached under each of those tests, did not reflect the reasoned decisionmaking required of administrative agencies. *Id.* We stated:

> As disputes arise, such as the current one, that force the Board to chart a course in the more ambiguous or disputed territory of … [a legal] test, the Board must accept responsibility for clarifying and identifying the standards that are guiding its decisions.

*Id.* at 1436. While not requiring it, we "urge[d] the Board … on remand … to attempt to articulate a majority-supported

statement of the rule that the Board will be applying now and in the future." *Id.* at 1436–37.

The problem in the instant case is even more difficult than the situation that the court faced in *United Food and Commercial Workers*, for here the result reached by the Board is not supported by reasonable opinions from a majority of its members.[5] In such a circumstance, we are constrained to return this case to the Board to allow for the articulation of a legal test upon which a judgment may rest.

B. *The Legal Flaws in the Concurrence's "Sole–Cause" Test*

■ As already noted, the dilemma posed in this case arises because the concurring opinion is founded on a construction of section 502 that is wrong as a matter of law. The concurrence held that a work stoppage is not protected by section 502 unless workplace health and safety conditions, even if abnormally dangerous, are the "sole cause" of the walkout. NLRB Decision, 309 N.L.R.B. at 1368.

The concurrence's sole-cause test is purportedly drawn from language in the Supreme Court's *Gateway Coal* decision, which stated that "a work stoppage called solely to protect employees from immediate danger is authorized by § 502." But the concurrence reads too much into the Court's language. To say that a strike called "solely to protect employees from immediate danger is authorized by § 502," is not the same as saying that "a strike is not protected by § 502 unless the sole reason for it is to protect employees from immediate danger." The fatal problem with the concurrence's reliance on the cited language from *Gateway Coal* is that the concurring opinion completely fails to acknowledge the different contexts involved in *Gateway Coal* and this case. *Gateway Coal* involved an employee strike that occurred while an implied no-strike obligation was still in effect. 414 U.S. at 373, 380–87,

---

5. In a somewhat analogous situation, the Board itself has noted: "In [a prior case] the Board plurality opinion rejected this doctrine, but there was no holding on the issue because the vote was split 2–2 on this point." *Mowhawk Liqueur Co.*, 300 N.L.R.B. 1075, 1075–76 n. 3 (1990), *enforced sub nom. General Indus. Employees Union, Local 42 v. NLRB*, 951 F.2d 1308 (D.C.Cir.1991).

94 S.Ct. at 634–35, 638–41 (finding that contractual agreement to submit disagreements to binding arbitration included disputes over safety and thus gave rise to implied obligation not to strike over such disputes). Here, however, the bargaining unit employees ceased working after the collective bargaining agreement had expired, so there was no no-strike obligation in effect. The sole-cause test cannot reasonably be applied in both of these situations, for this would lead to absurd results.

For example, in a situation where a union contract has expired and employees may lawfully engage in an economic strike, the sole-cause test would have the effect of precluding application of section 502 where employees strike because they want higher wages *and* because fires break out at their work stations whenever they attempt to operate their equipment. Because it could always be said that the employees' concern for their safety was mixed with desires for a better economic package, the sole-cause test would preclude such a walkout from the protections of section 502. This is a ridiculous result, however, because there could be no doubt in this hypothetical that the employees were protesting abnormally dangerous conditions— that they also desired better wages is irrelevant.

▮ The concurrence states that if the union simply informs the employer that the work stoppage will terminate upon the correction of the abnormally dangerous conditions, this would satisfy the sole-cause test "at least prima facie." *See* NLRB Decision, 311 N.L.R.B. at 1369. However, the concurrence's position is hopelessly shortsighted: the federal labor laws give employees the right to engage in lawful economic strikes upon expiration of the parties' agreement. *See* 29 U.S.C. § 157 (1988); *see generally NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14–18, 82 S.Ct. 1099, 1102–04, 8 L.Ed.2d 298 (1962). Employees cannot be made to promise to return to work from a lawful economic strike in order to prove the legitimacy of their concern over the unsafe conditions. Accordingly, in cases such as this, the sole-cause rule would clearly achieve results contrary to federal labor policy.[6]

### C. *Legal Principles Applied to this Case*

▮ With only the plurality opinion remaining to justify the Board's result in this case, we are left with a position, rational or not, supported by only two of four Board members. It is thus clear that *the Board* as a whole has failed to articulate an appropriate legal standard for the resolution of this case. Because we cannot discern a Board position, we are compelled to remand the case for reconsideration. The Board must "articulate a majority-supported statement of the rule that [it] will be applying now and in the future," *United Food & Commercial Workers*, 880 F.2d at 1436–37, in determining the applicability of section 502 in the context of occupational exposure to low-level radiation.

▮ Board counsel objects to a remand, arguing that the agency's decision in this case is entitled to deference because the judgment dismissing the Union's complaint was supported by a majority of Board members. This contention is well wide of the mark, however, for, given its legal infirmity, the concurring opinion can count for nothing

**6.** Of course, since it is normally impermissible for employees to strike or cease working while a no-strike obligation is in effect, *see Mastro Plastics*, 350 U.S. at 280, 76 S.Ct. at 356–57, the concurrence's concern about mixed motives in such situations would be more appropriate. Even here, however, the sole-cause rule could lead to anomalous results. In *Mastro Plastics*, 350 U.S. at 279–84, 76 S.Ct. at 356–59, the Supreme Court suggested that, at least in some circumstances, a general no-strike clause may not waive the employees' right to strike in response to unfair labor practices committed by the employer. Notwithstanding *Mastro Plastics*, the sole-cause test would have the effect of precluding section 502 coverage where employees walked off the job in response to egregious employer unfair labor practices *and* abnormally dangerous working conditions. As in the context where the union contract has expired, however, this would be an absurd result, for the employees certainly walked off the job because of abnormally dangerous working conditions, regardless of whether the employer had also committed unfair labor practices. Thus, the sole-cause rule might make sense only where a walk-out occurred while a no-strike obligation was in effect *and* in the absence of employer unfair labor practices (of the sort contemplated by *Mastro Plastics*), which was the case in *Gateway Coal*.

in this case. Lest we are misunderstood, we should state the obvious: Our decision in this case does not deprecate, but rather vindicates, the administrative process, as well as the Board's primary authority and responsibility for making federal labor policy. When, as here, the agency has failed to take a position, we do not substitute our judgment for that of the agency or attempt to surmise what the agency's position might have been. *See Burlington Truck Lines,* 371 U.S. at 169, 83 S.Ct. at 246 ("[T]he purpose of th[is] rule is to avoid propelling the court into the domain which Congress has set aside exclusively for the administrative agency.") (internal quotations and alterations omitted). Rather, we insist that *the agency,* to which Congress has delegated principal policymaking authority, choose and clearly articulate its rule. *See Acme Die Casting,* 26 F.3d at .166 (while reviewing court "will be bound [under *Chevron* ] to accept any reasonable rule that the Board selects . . . [, it is] *the Board* [which] must select the rule") (emphasis added); *City of Kansas City,* 923 F.2d at 192 (where agency has offered no interpretation of statutory provision, agency not entitled to deference on review, because "[d]eference under *Chevron* . . . can be accorded only to a judgment of the agency itself").

### III. CONCLUSION

This case is hereby remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*